(No. 41498.—

Nathan ·F. ·Leopold, Jr., Appellant,· *vs.* Meyer Levin *et al.,* Appellees. ···

*Opinion filed May 27, 1970.*

KLUCZYNSKI, J., took no part.

ELMER GERTZ and HAROLD R. GORDON, both of Chicago, for appellant.

ROBERT W. BERGSTOM, and ROHDE, DAHLGREN & OLSON, both of Chicago, for appellees Darryl F. Zanuck Productions, Inc., Twentieth Century-Fox Film Corp., and the other "motion picture".

LEON M. DESPRES, of Chicago, for appellees Meyer Levin and the other "book".

Mr. JUSTICE WARD delivered the opinion of the court:

Nathan F. Leopold, Jr., the plaintiff, brought an action in the circuit court of Cook County, which was in the nature of a suit alleging a violation of the right of privacy. The defendants included: the author, publishers and several local distributors of a novel and a play, entitled "Compul-

sion," and the producer, distributor and Chicago area exhibitors of a related motion picture of the same name. The trial court granted the plaintiff's motion for a summary judgment on the question of liability and reserved the issue as to the amount of damages. The defendants appealed to this court but on the plaintiff's motion the appeal was dismissed on the ground that the judgment was interlocutory and, hence, unappealable. When remanded, the case was assigned to a different judge of the circuit court for pretrial consideration on the question of damages. The defendants at that point contested the judgment which had been entered by the predecessor judge. After extended proceedings the succeeding judge vacated the summary judgment in favor of the plaintiff and granted the motions of the defendants for summary judgment and judgment on the pleadings. A direct appeal has been taken by the plaintiff to this court, as a constitutional question is involved.

In 1924, Richard Loeb, who is deceased, and Nathan F. Leopold, Jr., the plaintiff, pleaded guilty to the murder and kidnapping for ransom of a 14-year-old boy, Bobby Franks. Following a presentence proceeding, each was given consecutive prison sentences of life and 99 years. The luridness of the crime, the background of the defendants, their representation by the most prominent criminal advocate of the day, the "trial," and its denouement attracted international notoriety. Public interest in the crime and its principals did not wane with the passage of time and the case became an historical *cause celèbre*.

The novel "Compulsion" was first published in hardcover in October 1956. The author was the defendant Meyer Levin, who had been a fellow student of Leob and Leopold and who had served as a reporter for a Chicago newspaper at the time of the crime. All concerned in this appeal agree that the basic framework of the novel, as well as of the subsequently produced movie, was factually provided by the kidnapping and murder of Bobby Franks, the events lead-

ing to the apprehension of Leopold and Loeb, and their prosecution. However, as the author himself, in the foreword of the book, wrote: "Though the action is taken from reality, it must be recognized that thoughts and emotions described in the characters come from within the author, as he imagines them to belong to the personages in the case he has chosen." And, "I follow known events. Some scenes are, however, total interpolations, and some of my personages have no correspondence to persons in the case in question. This will be recognized as the method of the historical novel. I suppose *Compulsion* may be called a contemporary historical novel or a documentary novel, as distinguished from a *roman à clef*. [That is, a novel drawing upon actual occurrences or real persons under the guise of fiction.]"

Neither the name of Loeb or Leopold appear in the foreword, and fictitious names are used in the novel itself for all persons who may have been involved in the case. However, the names of Loeb and the plaintiff were used in advertising the novel. Illustrative of this, on the paper jacket to the hardcover edition it was said: "This book is a novel suggested by what is possibly the most famous and certainly one of the most shocking crimes ever committed in America —the Leopold-Loeb murder case." On the page preceding the title page of the paperback edition of "Compulsion", which was first published in 1958, the following appeared: "In his novel based upon the Leopold-Loeb case, Meyer Levin seeks to discover the psychological motivation behind this monstrous deed." The back cover of the paperback noted that " 'Compulsion' is a spellbinding fictionalized account of one of the most famous and shocking crimes of our age—the Leopold-Loeb murder case."

The case had been of interest to other authors. For example, in 1957, a novel, "Nothing But The Night," by James Yaffe was published. It bore a fictionalized resemblance to the Leopold-Loeb case, but had a different locale and no reference was apparently made in the advertising of

it to the actual case. In the same year a factual account of the life and crimes of Leopold and Loeb by Maureen McKernan, entitled, "The Amazing Crime and Trial of Leopold and Loeb" was published and widely advertised. In 1957, too, an account of the kidnapping, murder and prosecution written by the plaintiff for compensation appeared in serialized form for several weeks in a Chicago newspaper. Story captions included: "Leopold Tells Own Story—How It Felt To Be A Killer" "Leopold Arrested; Time For Him To Use Alibi"; "Darrow Makes Masterful Plea For Understanding." He was granted parole in 1958 and that year his autobiographical story, "Life Plus 99 Years," which included a description of his detection and prosecution and their personal consequences, was published. It was given extensive publicity.

The motion picture "Compulsion" was released in April, 1959. Several major characters in the film, including the one corresponding to the appellant, were styled to resemble actual persons in the case. Fictitious names were used, though, and no photographs of the appellant or any other person connected with the case appeared in the movie or in any material used to promote the film. The promotional material did refer to the crime. In a brochure prepared for movie exhibitors, entitled "Vital Statistics," 20th Century Fox Film Corporation, a defendant, outlined the likenesses and differences between the movie and the actual events, and declared: "It should be made clear emphatically that "Compulsion' is not an effort to reproduce the crime of Leopold and Loeb, nor their trial. The screenplay was taken from a recognized work of fiction 'suggested' by the Leopold-Loeb case, but neither the author of the book nor the producer of the film has attempted anything but to tell a dramatic story. * · * * The picture is in no way a documentary and its makers have attempted only to translate the book into terms of good dramaturgy." One motion picture exhibitor, the Woods Theatre in Chicago, owned by a defendant here, in

advertising the movie used a photographic enlargement of the back cover of the paperback book edition of "Compulsion" in which the plaintiff's name was used, as has been described. It displayed also a blow-up or enlargement of portions of reviews given the movie in which the plaintiff's name had been mentioned. His name also was introduced during personal, radio and television interviews in various cities by certain of the defendants in the course of their promotion of the motion picture.

The plaintiff acknowledges that a documentary account of the Leopold-Loeb case would be a constitutionally protected expression, since the subject events are matters of public record. Also constitutionally protected, the plaintiff continues, would be a completely fictional work inspired by the case if matters such as the locale would be changed and if there would be no promotional identification with the plaintiff. Leopold's claim is that the constitutional assurances of free speech and press do not permit an invasion of his privacy through the exploitation of his name, likeness and personality for commercial gain in "knowingly fictionalized accounts" of his private life and through the appropriation of his name and likeness in the advertising materials. Denying him redress would deprive him, he argues, of his right to pursue and obtain happiness, guaranteed by section I of article II of the constitution of Illinois.

While the question of a right of privacy has not until now been considered by this court, such a right has been recognized in other courts of this State. It was first acknowledged at the appellate level in the case of *Eick* v. *Perk Dog Food Co.* (1952), 347 Ill. App. 293, and there has been implicit recognition of it by the legislature through its enactment of a statute of limitations for suits complaining of violations of privacy. (Ill. Rev. Stat. 1967, ch. 83, par. 14; see Laws of 1959, p. 1770.) A right of privacy has been recognized in more than 30 States in addition to the District of Columbia. See *Time, Inc.* v. *Hill,* 385 U.S. 374, 383, n.7,

413, 17 L.E.2d 456, 464 n.7, 481, 87 S. Ct. 534; Prosser, Law of Torts, 3rd ed. (1964), sec. 112 at 831-832.

The dimensions of the right in Illinois have thus far been conservatively interpreted under the appellate courts' decisions. In *Eick,* where the interest in privacy was first admitted, a blind girl's photograph was used without her consent in promoting the sale of dog food. The court held that the allegation of these facts stated a good cause of action for violation of the right of privacy. The court observed, though, that the right of privacy is a limited one in areas of legitimate public interest, as where there is a legitimate news interest in one's photograph or likeness as a public figure. (347 Ill. App. at 299; but *cf. Annerino* v. *Dell Publishing Co.,* 17 Ill. App. 2d 205.) Later, in *Bradley* v. *Cowles Magazines Inc.* (1960), 26 Ill. App. 2d 331, a case holding that a mother had no cognizable claim that her right of privacy had been violated by the publisher of *Look* magazine when it publicized the murder of her son, the court stated that *Eick,* itself, was limited to its conclusion—"that a private person would be protected against the use of his portrait for commercial advertising purposes." (26 Ill. App. 2d at 333.) It was observed in *Bradley* too, that the purpose underlying the right of privacy action was "To find an area within which the citizen must be left alone" and that, viewing the possible development of the right, "It is important * * * that in defining the limits of this right, courts proceed with caution." (26 Ill. App. 2d at 334.) There have been no appellate court cases subsequent to *Bradley,* which have admitted a broader right than was announced in *Eick.* See *Buzinski* v. *Do-All Co.,* 31 Ill. App. 2d 191; *Carlson* v. *Dell Publishing Co., Inc.,* 65 Ill. App. 2d 209.

We agree that there should be recognition of a right of privacy, a right many years ago described in a limited fashion by Judge Cooley with utter simplicity as the right "to be let alone." Privacy is one of the sensitive and necessary human values and undeniably there are circumstances

under which it should enjoy the protection of law. However, we must hold here that the plaintiff did not have a legally protected right of privacy. Considerations which in our judgment require this conclusion include: the liberty of expression constitutionally assured in a matter of public interest, as the one here; the enduring public attention to the plaintiff's crime and prosecution, which remain an American *cause celèbre;* and the plaintiff's consequent and continuing status as a public figure.

It has been expressly recognized by the Supreme Court that books, as well as newspapers and magazines, are normally a form of expression protected by the first amendment and that their protection is not affected by the circumstances that the publications are sold for profit. (*Time Inc.* v. *Hill,* 385 U.S. 374, 397, 17 L.Ed. 2d 456, 472, and cases there cited.) Pertinently, too, the Supreme Court earlier declared in *Joseph Burstyn, Inc.* v. *Wilson,* 343 U.S. 495, 501-2, 96 L. Ed. 1098, 1105-6, 72 S. Ct. 777: "It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform. As was said in *Winters* v. *New York,* 333 U.S. 507, 510, 92 L. Ed. 840, 847, 68 S. Ct. 655: 'The line between the informing and the entertaining is too elusive for the protection of that basic right [a free press]. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine.' It is urged that motion pictures do not fall within the First Amendment's aegis because their production, distribution, and exhibition is a large-scale business conducted for private profit. We cannot agree. That books, newspapers, and magazines are published and sold for profit

does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment. We fail to see why operation for profit should have any different effect in the case of motion pictures. * * * For the foregoing reasons, we conclude that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments."

In *Time, Inc.* v. *Hill,* the Supreme Court for the first time had occasion to consider directly the effect of the constitutional guarantees for speech and press upon the rights of privacy. There, as will be seen, the right of privacy when involved with the publication of a matter of public interest was viewed narrowly and cautiously by the court. That decisional attitude toward publication is consistent with other first amendment holdings of the court in recent years, especially in the areas of libel and obscenity, where the announced objective was to insure "uninhibited, robust and wide-open" discussion of legitimate public issues or to protect published materials unless they are "utterly without redeeming social value." *E.g.* (libel) *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, 270, 11 L. Ed. 2d 686, 701, 84 S. Ct. 710; *Curtis Publishing Co.* v. *Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975; (obscenity) *A Book* v. *Attorney General* (1966), 383 U.S. 413, 418, 419, 16 L. Ed. 2d 1, 5, 6, 86 S. Ct. 975; *Redrup* v. *New York* (1967), 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414.

It is of importance here, too, that the plaintiff became and remained a public figure because of his criminal conduct in 1924. No right of privacy attached to matters associated with his participation in that completely publicized crime. (See Prosser, Law of Torts, 3rd ed. (1964), sec. 112; Restatement of the Law of Torts, § 867, Comment *c.*) The circumstances of the crime and the prosecution etched a deep public impression which the passing of time did not extinguish. A strong curiosity and social and news interest

in the crime, the prosecution, and Leopold remained. (Consider: *Bernstein* v. *National Broadcasting Co.,* 129 F. Supp. 817, 835; *Estill* v. *Hearst Publishing Co.* (7th cir.), 186 F.2d 1017; Restatement of the Law of Torts, § 867, Comment *c.*) It is of some relevance, too, in this consideration, that the plaintiff himself certainly did not appear to seek retirement from public attention. The publication of the autobiographical story and other writings and his providing interviews unquestionably contributed to the continuing public interest in him and the crime. Having encouraged public attention " 'he cannot at his whim withdraw the events of his life from public scrutiny.' " *Estate of Hemingway* v. *Random House, Inc.,* 23 N.Y.2d 341, 244 N.E.2d 250, 258.

A carefully narrowed argument of the plaintiff appears to be that the defendants through "knowingly fictionalized accounts" caused the public to identify the plaintiff with inventions or fictionalized episodes in the book and motion picture which were so offensive and unwarranted as to "outrage the community's notions of decency." (*Sidis* v. *F-R Pub. Corp.* (2d cir.), 113 F.2d 806, 809; see, *Time, Inc.* v. *Hill,* 385 U.S. at 382, 383, 17 L. Ed. 2d at 464, n. 7.) However, the core of the novel and film and their dominating subjects were a part of the plaintiff's life which he had caused to be placed in public view. The novel and film were derived from the notorious crime, a matter of public record and interest, in which the plaintiff had been a central figure. Further, as the trial court appeared to do, we consider that the fictionalized aspects of the book and motion picture were reasonably comparable to, or conceivable from facts of record from which they were drawn, or minor in offensiveness when viewed in the light of such facts. *Sidis,* upon which the plaintiff bottomed this argument of outraging "the community's notions of decency," involved the publishing of a "profile" of a one-time prodigy. A magazine article disclosed his undistinguished achievement as an adult and described some of his eccentricities. The court held the publi-

cation proper but in a dictum observed: "Revelations may be so intimate and so unwarranted in view of the victim's position as to outrage the community's notions of decency." Even if one were to accept the validity of the dictum for the purpose of discussing it, the genesis of the fictionalized episodes in "Compulsion," as we have observed, can be traced in a substantial way to the exposed conduct of Leopold. Argument that the community's notions of decency were outraged here must be regarded as fanciful.

The contention that a right of privacy was violated by an appropriation, without consent, of the plaintiff's name and likeness for the commercial gain of the defendants through their advertisements must also fail. The circumstances here obviously are distinguishable from those in cases such as *Eick* v. *Perk Dog Food Co.*, which the plaintiff cites. There, as has been noted, a likeness, *i.e.*, a photograph of a girl who was clearly not a public figure, was "appropriated" to promote a purely commercial product. Unlike here, no question of freedom of expression was presented. The reference to the plaintiff in the advertising material concerned the notorious crime to which he had pleaded guilty. His participation was a matter of public and, even, of historical record. That conduct was without benefit of privacy.

We consider that *Time, Inc.* v. *Hill*, 385 U.S. 374, 17 L. Ed. 2d 456, to which reference has been made, does not support the plaintiff's positions. *Hill* and his family had been held in their home as hostages for 19 hours by escaped convicts. Their captors did not mistreat them in any way. After the incident Hill moved to another State and discouraged all attempts to keep his family in public view. A book and later a play partly drawn, it would appear, from the incident were published and *Life* magazine carried an article about the play. In the play the author had some members of the captive family subjected to violence and a daughter to verbal abuse. *Life's* article allegedly gave the false

impression that the play did reflect what had happened to the Hill family. The Supreme Court held that the constitutional protections of free speech and press prevented Hill's recovering under the New York privacy statute because of this false report of a matter of public interest, unless upon remand of the case there was a showing that the magazine had published the report with knowledge of its falsity or in reckless disregard of the truth. It is clear that *Time, Inc.* involved a situation essentially dissimilar from the one here. The case involved what was claimed to be a false but purportedly factual account of the Hill incident. Here, the motion picture, play and novel, while "suggested" by the crime of the plaintiff, were evidently fictional and dramatized materials and they were not represented to be otherwise. They were substantially creative works of fiction and would not be subject to the "knowing or reckless falsity" or actual malice standards discussed in *Time, Inc.* v. *Hill,* where the court considered an untrue but supposedly factual magazine account. Consider: Privacy, Defamation and the First Amendment: The Implications of *Time, Inc.* v. *Hill,* 67 Columbia L. Rev. 926, 944; Right of Privacy v. Free Press: Suggested Resolution of Conflicting Values, 28 Ind. L. J. 179, 184-187; *Spahn* v. *Julian Messner, Inc.,* 21 N.Y.2d 124, 233 N.E.2d 840, 845 (dissenting opinion) ; *Donahue* v. *Warner Bros. Pictures Distributing Corp.,* 2 Utah 2d 256, 272 P.2d 177, 182.

*Spahn* v. *Julian Messner, Inc.,* 21 N.Y.2d 124, 233 N.E.2d 840, which is offered as authority by the plaintiff, is basically irrelevant to the questions posed by "Compulsion." There, a publication which was offered as a biography of Warren Spahn, the well known baseball pitcher, contained much false material concerning his private life. A judgment under the New York privacy statute in favor of Spahn, a public figure, was upheld and the case was apparently settled, though the Supreme Court had noted "probable jurisdiction" and placed the case on its summary

calendar. It is unnecessary to consider the validity of the holding because of the clear dissimilarity between "Compulsion" and a biography.

There was also error, the plaintiff complains, in the second trial court's vacation of the summary judgment, which had been entered for Leopold on the issue of liability by the first trial court, and in ordering summary judgment for the defendants. The argument is that the second trial court's authority was confined to pretrial matters relating to damages under Rule 218 of this court and that it wrongfully acted as a reviewing court when it vacated the summary judgment for the plaintiff. However, section 57(3) of the Civil Practice Act which authorizes summary judgments on the sole issue of liability, declares that such judgments are "interlocutory in character." (Ill. Rev. Stat. 1967, ch. 110, par. 57(3).) An interlocutory order may be modified or vacated at any time before final judgment. (*Richichi* v. *City of Chicago,* 49 Ill. App. 2d 320, 325.) While full and careful consideration should be given before such a judgment is vacated, it may, before final judgment, be set aside to correct an error. *Shaw* v. *Dorris,* 290 Ill. 196, 204; *Roach* v. *Village of Winnetka,* 366 Ill. 578; see also *McGilton* v. *Mobay Chemical Co.* (N.D. West Va.), 40 F.R.D. 483.

We conclude that the judgment of the circuit court of Cook County which vacated the summary judgment for the plaintiff on the issue of liability and granted summary judgment and judgment on the pleadings in favor of the defendants was proper. Accordingly, the judgment is affirmed.

*Judgment affirmed.*

Mr. Justice KLUCZYNSKI took no part in the consideration or decision of this case.