THOMAS P. BERESKY *et al.*, Plaintiffs-Appellants, *v.* J. PETER TESCHNER, d/b/a "The Doings", Defendant-Appellee.

Second District    No. 77-95

Opinion filed October 10, 1978.

Mark A. Lies, II, and Robert Joyce, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellants.

Paul A. Teschner, of Chicago, for appellee.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

Plaintiffs, Thomas and Daphne Beresky brought suit against defendant, J. Peter Teschner, d/b/a "The Doings", a weekly newspaper, following the publication of a series of articles in "The Doings" of which Teschner is the owner and publisher. Plaintiffs' amended complaint was in four counts: count I, libel; count II, intentional infliction of mental distress; count III, negligent infliction of mental distress; and count IV, invasion of privacy. The trial court dismissed all four counts and denied plaintiffs leave to file any amended counts to their amended complaint. Plaintiffs appeal the dismissal of counts I, II and IV of their amended complaint, and the denial of leave to amend those counts. Plaintiffs have not appealed the dismissal of count III.

The initial article of the series which forms the basis of this suit appeared in the October 23, 1975, issue of "The Doings." The article reported the death of Cary Beresky, the 18-year-old son of the plaintiffs, from an apparent drug overdose. According to the article, Cary was a fugitive from the law having failed to appear in court on a charge of unlawful possession of a hypodermic needle allegedly used for shooting up heroin and that since his 18th birthday he had been arrested on charges ranging from traffic violations to burglary. The article also stated that a reliable source had told "The Doings" that Cary was reportedly a major seller and user of heroin in Hinsdale.

The October 30, 1975, issue of "The Doings" carried four letters to the editor, all highly critical of the newspaper for publishing such an article and expressing sympathy towards plaintiffs and their family. The November 6, 1975, issue carried another letter to the editor, again critical of the newspaper and expressing sympathy for plaintiffs; this letter mentioned Mrs. Beresky by name and stated that she had recently undergone extensive surgery for cancer. That issue also carried an editorial responding to the criticisms expressed in the letters to the editor. The issue of November 13, 1975, carried an editorial again responding to the criticism leveled at the newspaper for publishing the October 23,

1975, article. Finally, the January 1, 1976, issue contained a synopsis of the news events which had occurred in the community in 1975; one of those mentioned was Cary Beresky's death from an apparent drug overdose.

Plaintiffs contend on appeal that the trial court erred in dismissing counts I, II, and IV of their amended complaint; that the trial court deprived plaintiffs of their right to have a jury determination of whether the facts supported the allegations of each count; and that the trial court abused its discretion in denying plaintiffs leave to file amended counts to their amended complaint.

In dismissing count I (libel), the trial court found that the plaintiffs had failed to allege that any false and defamatory words were written "of and concerning plaintiffs." The plaintiffs contend that the original article, the letters to the editor and the editorial responses referred to the family of Cary Beresky and thereby to plaintiffs and that the members of the community understood the articles to refer to plaintiffs—one of the letters to the editor referred to Mrs. Beresky by name. Plaintiffs also contend that third parties understood the words of the articles to mean that plaintiffs knew or had knowledge of, condoned or participated in the illegal drug activities of their son, and that the trial court erred in denying plaintiffs the opportunity to present proof of their contentions to the jury.

■■ We agree with plaintiffs that under Illinois law a publication may constitute a libel against an individual without mentioning him by name so long as it appears that some third party reasonably understood the writing to have referred to that individual. (*Algozino v. Welch Fruit Products Co.* (1951), 345 Ill. App. 135, 102 N.E.2d 555.) However, whether an article was in fact understood by readers to refer to plaintiffs might ultimately be a question for the jury, the preliminary determination whether the article is capable of being so understood is a question of law. *Troman v. Wood* (1975), 62 Ill. 2d 184, 189, 340 N.E.2d 292, 294.

In *Troman,* a newspaper article appeared related to a series of burglaries and other criminal activities by a gang of youths in an area of Chicago. One edition of the newspaper carried a photograph of the plaintiff's home with a caption "Home of Mrs. Mary Troman at [address], Thomas Troman testified that he is a member of the gang." Further, the article quoted a local resident as referring to plaintiff's house as the gang headquarters and that his stolen TV set was in the basement. Plaintiff contended that the article and picture, when taken together, were understood by readers as meaning that plaintiff's house served as headquarters for the gang and that plaintiff was in some manner associated with the gang. Our supreme court held that if the article were read as meaning that plaintiff allowed her house to be used as a headquarters for persons engaging in criminal acts or for storage of stolen goods, it could hardly be doubted that her reputation would be injured.

Whether the article was in fact so understood was a question for the jury.

Plaintiffs here submit that because the article, letters and editorial published by the defendant gave the address of plaintiffs' home as Cary's place of residence and referred to plaintiffs' family, particularly Mrs. Beresky, by name, their reputations have been injured by the imputation that certain illicit drug activities occurred at plaintiffs' home and that plaintiffs were associated with the alleged criminal activity of their son, either by having knowledge of, condoning or actually participating in such activity.

As expressed in its written memorandum in this case, the trial court was of the opinion that the facts of the present case are clearly distinguishable from those in *Troman*. First, the allegations clearly show that the alleged defamatory words, *i.e.*, the alleged drug activity, referred only to Cary Beresky and not to the plaintiffs. Secondly, a review of the facts in *Troman* reveal that the innuendo there clearly referred to activities at and inside the plaintiff's home, while no such innuendo as to plaintiffs or their home is apparent in this case. By no stretch of the imagination does the mere mention of plaintiffs' address and the references to plaintiffs' family in the letters to the editor (not the article) conjure up visions of plaintiffs' residence being used as the headquarters of a "family drug business" or even condonation of Cary Beresky's alleged involvement with drugs.

■■ Since the preliminary determination whether the articles are capable of being understood as referring to plaintiffs was properly resolved in defendant's favor by the trial court, no question remains for the jury to decide on this issue. (*Troman v. Wood.*) We therefore affirm the trial court's dismissal of count I. In passing, we note that the briefs of both parties contain arguments on the issue of "actual malice." However, in view of our disposition of count I, we need not discuss those arguments.

■■ Turning to count II, while agreeing with plaintiffs that Illinois recognizes a cause of action under the theory of intentional infliction of mental distress (see *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157), the trial court concluded that the amended complaint in this case failed to contain any allegations of facts to support such a cause of action.

In *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765, our supreme court recently delineated the conduct which gives rise to a cause of action on this theory, stating as follows:

> "First, the conduct must be extreme and outrageous. The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities. '* * * Liability has been found only where the conduct has been so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency * * *.' [Citation.]

Second, infliction of emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be *severe*. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable. 'The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.' [Citation.]

Third, reckless conduct which will support a cause of action under the rules stated is conduct from which the actor knows severe emotional distress is certain or substantially certain to result. * * * Liability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it. [Citation.]

Fourth, * * * the extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests." (66 Ill. 2d 85, 89-90, 360 N.E.2d 765, 767.)

In *Public Finance,* the defendant had brought a counterclaim alleging intentional infliction of mental distress, caused by agents of the plaintiff in attempting to collect a debt. The acts of the agents included calling defendant repeatedly; calling defendant at a hospital where defendant's daughter was hospitalized and defendant herself was "sick and nervous"; inducing defendant to write a "bad" check, promising that the check would not be processed, and then telephoning an acquaintance of defendant's informing her defendant was writing bad checks; visiting defendant's home and upon being informed that defendant had no money, using defendant's telephone to call plaintiff and describe defendant's household goods; and refusing to leave defendant's home until her son came into the room.

In that case, the supreme court found that the conduct alleged in *Public Finance* was not of such an extreme and outrageous nature as to constitute a basis for recovery under the theory alleged. The court pointed out that a creditor is not liable where he does no more than insist on his legal rights and must be given some latitude though such insistence is certain to cause emotional distress. The debtor is protected only from oppressive or outrageous conduct which was not present there.

■■ It is a legal question for the court to determine whether a complaint

states a cause of action for an intentional infliction of mental distress. (See *Rabens v. Jackson Park Hospital Foundation* (1976), 40 Ill. App. 3d 113, 351 N.E.2d 276.) We agree with the trial court that the facts pleaded by plaintiffs here, stripped of all conclusions, can not be regarded as so extreme and outrageous as to state a cause of action under this theory.

■■ The trial court further found that the complaint did not contain any allegations of facts showing substantial or severe mental distress. Plaintiffs alleged in count II of their amended complaint,

> "16. That the willful and intentional publication of the aforesaid articles by the Defendant has caused and continues to cause the Plaintiffs severe emotional disturbance, great mental anguish, and severe nervous exhaustion."

As was quoted from the *Public Finance* case, the intensity and the duration of the distress are factors to be considered in determining its severity. The initial article appeared in late October 1975, followed by letters of sympathy to plaintiffs, two editorials, and finally, a brief notation of Cary Beresky's death in the January 1, 1976, issue of the newspaper. The material was spread over a period of approximately two months .nd contained much that was in sympathy with plaintiffs. Considering the contents of the material published and the publishing time span, the trial court was correct in its finding. Therefore we affirm the trial court's dismissal of count II.

Plaintiffs contend that the trial court erred in dismissing count IV of their amended complaint (invasion of privacy). Plaintiffs point out that the trial court admitted that the published matter concerning plaintiffs and their family could be interpreted as being highly offensive to a reasonable person, but that it erred when it found the published matters of legitimate concern to the public.

The right of privacy was first recognized in Illinois in the case of *Eick v. Perk Dog Food Co.* (1952), 347 Ill. App. 293, 106 N.E.2d 742, where a blind girl's photograph was used in promoting the sale of dog food; the court held that the allegations of these facts stated a good cause of action for violation of the right of privacy. The court observed though, that the right of privacy is a limited one in areas of legitimate public interest, as where there is a legitimate news interest in one's photograph or likeness as a public figure.

In the case of *Leopold v. Levin* (1970), 45 Ill. 2d 434, 259 N.E.2d 250, our supreme court agreed that there should be recognition of a right to privacy or the right "to be let alone." However, the supreme court refused to extend that right to the plaintiff who more than 40 years before had pleaded guilty to the murder of a young boy. The supreme court stated:

> "Privacy is one of the sensitive and necessary human values and

undeniably there are circumstances under which it should enjoy the protection of law. However, we must hold here that the plaintiff did not have a legally protected right of privacy. Considerations which in our judgment require this conclusion include: the liberty of expression constitutionally assured in a matter of public interest, as the one here; the enduring public attention to the plaintiff's crime and prosecution, which remain an American *cause cèlèbre*; and the plaintiff's consequent and continuing status as a public figure." (45 Ill. 2d 434, 440-41, 259 N.E.2d 250, 254.)

Further on in its opinion the supreme court stated:

"In *Time, Inc. v. Hill* [(1967), 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534], the Supreme Court for the first time had occasion to consider directly the effect of the constitutional guarantees for speech and press upon the rights of privacy. There, as will be seen, the right of privacy when involved with the publication of a matter of public interest was viewed narrowly and cautiously by the court. That decisional attitude toward publication is consistent with other first amendment holdings of the court in recent years, especially in the areas of libel and obscenity, where the announced objective was to insure 'uninhibited, robust and wide-open' discussion of legitimate public issues or to protect published materials unless they are 'utterly without redeeming social value.'" 45 Ill. 2d 434, 442, 259 N.E.2d 250, 255.

It is not necessary for an individual to actively seek publicity in order to be found to be in the "public eye." In *Metter v. Los Angeles Examiner* (Cal. App. 1939), 95 P.2d 491, in rejecting a husband's theory that the newspaper publication of a picture of his wife who had committed suicide invaded his right to privacy, the reviewing court stated:

"It is also recognized that the right of privacy does not prohibit any publication of matter which is of public or general concern; and while the general object in view is to protect the privacy of private life, nevertheless, "to whatever degree and in whatever connection a person's life has ceased to be private, before the publication under consideration has been made, to that extent the protection is to be withdrawn." Brandeis—Warren Essay, 4 Harvard L. Rev. 193, p. 214. * * *" (95 P.2d 491, 496.)

In *Rozhon v. Triangle Productions* (7th Cir. 1956), 230 F.2d 359, the reviewing court held that a father, whose son had died of narcotic poisoning, had been catapulted into an area of legitimate public interest.

Plaintiffs charge that defendant did not confine itself to merely reporting the fact of their son's death and the alleged cause thereof, but

embarked on a campaign to publish unfounded charges of illegal drug activity and to expose to the public the grief, humiliation and shame experienced by plaintiffs at the death of their son and at these charges.

■■ While the trial court did find that the published matter could be interpreted as being highly offensive to a reasonable person, based upon the case law both from our own and other jurisdictions we can not agree with plaintiffs that the trial court erred in finding that the published matter was of legitimate concern to the public. The family's grief at the loss of a loved one, particularly that of a teenager, is understandably great; however, the concern of the community of which this young man was and his family still is a part, over the drug activity which allegedly brought about his death is also great. No one, not even plaintiffs we think, would deny that the subject of drug use is a matter of great controversy and of great public concern no matter which side is being argued. While plaintiffs categorize the material published here as a campaign on the part of defendant to expose plaintiffs' grief and humiliation to the public, the initial article published inspired several readers to write letters to the newspaper both supportive and sympathetic towards plaintiffs and their family. Indeed, the mention of Mrs. Beresky by name and her surgery for cancer was made in a letter to the editor, criticizing the newspaper and extending sympathy to plaintiffs. We are of the opinion that the trial court was correct in finding that the published matter was of legitimate concern to the public. We therefore affirm the trial court's dismissal of count IV.

■■ Finally plaintiffs contend that the trial court abused its discretion in denying plaintiffs leave to file amendments to their amended complaint. The power to allow amendments should be freely used so that a party may fully present his cause; however, despite this extensive freedom, a party has no absolute right to amend his pleadings. It is for the trial court to decide, in the exercise of sound discretion, whether to allow the proposed amendments. (*Banks v. United Insurance Company of America* (1975), 28 Ill. App. 3d 60, 328 N.E.2d 167.) The test to be applied in determining whether such discretion was properly exercised is whether it furthers the ends of justice, and in such regard, the court may properly consider the efficacy of a claim in passing on a motion for leave to amend. *Sapp v. Johnston* (1973), 15 Ill. App. 3d 119, 303 N.E.2d 429.

■■ Here, the plaintiff had already filed an amended complaint; the record contains extensive briefs filed in the trial court with the plaintiff filing a responsive brief to the last one filed by the defendant. The trial judge rendered a detailed written opinion which sustained defendant's motion to dismiss and specifically denied the motion of the plaintiffs seeking leave to further amend the complaint. Since we find nothing in the record evidencing an abuse of discretion, we hold that the trial judge's

denial of plaintiffs' motion to amend the complaint should not be disturbed.

On the basis of the foregoing reasons the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

SEIDENFELD, P. J., and BOYLE, J., concur.