FOURTH DIVISION
AUGUST 2, 2007

No. 1-06-0870

| | | |
|---|---|---|
| JAMES BROWN, THE NEW JAMES BROWN ENTERPRISES, INC., and JESUS MUHAMMAD-ALI, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| ACMI POP DIVISION, a Division of Conquest Operator Services Corporation, CONQUEST LONG DISTANCE, B&L LICENSE, INC., DOLLAR BILL WALLER, ZERO HOUR RECORDS, FRANK CICERO, d/b/a Globe Posters, | ) ) ) ) ) ) | Honorable |
| | ) | Allen S. Goldberg, |
| Defendants-Appellants. | ) | Judge Presiding. |

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

This is an interlocutory appeal pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308). Plaintiffs, singer and recording artist James Brown, The New James Brown Enterprises, Inc., and Jesus Muhammad-Ali, filed a complaint against defendant, the Corbis Corporation (Corbis),[1] a company that licenses copyrights for stock photographs and images, seeking damages and other relief in connection with Corbis's display of photographic images of James Brown on Corbis's website. Corbis appeals from the trial court's denial of its motion to dismiss counts III and VI of plaintiffs' amended complaint.

---

[1]This appeal involves only Corbis.

On March 22, the trial court certified the following questions for appeal pursuant to Supreme Court Rule 308:

"1. Whether the circuit court erred in denying Corbis's motion to dismiss counts III and VI under 735 ILCS 5/2-619 and in rejecting Corbis's argument that the undisputed facts show that Corbis did not use photographs of James Brown for an improper commercial purpose under either the Illinois common law or the Illinois Right of Publicity Act, 735 ILCS 1075/1, *et seq.*";

and

"2. Whether the circuit court erred in its July 23, 2004, order and memorandum opinion by holding that the U.S. Copyright Act does not preempt the claims asserted by Plaintiffs in counts III and VI of the amended complaint."

The Archive Council of America (ACA) filed an *amicus curie* brief in support of Corbis's position.

For the following reasons, we answer each of the certified questions in the negative, affirm the judgement of the trial court, and remand this matter for further proceedings consistent with this opinion.

BACKGROUND

The late James Brown was a professional singer and recording artist of international renown.[2] In October 2002, Brown filed a multicount complaint against, *inter alia*, Corbis,

[2]Prior to oral arguments in this case, but after the filing of all parties' briefs, plaintiff

alleging that Corbis infringed Brown's right of publicity through Corbis's unauthorized commercial use of his image on the Internet. In counts III and VI, respectively, Brown alleged that Corbis's Internet sale of photographs of Brown violates Brown's right of publicity under common law and the Illinois Right of Publicity Act (735 ILCS 1075/1, *et seq* (West 2002)) (Publicity Act).[3]

On January 13, 2003, Corbis filed a motion to dismiss counts III and VI of Brown's complaint pursuant to sections 2-615 and 2-619 of the Illinois Code of Civil Procedure. (735 5/2-615, 619 (West 2002)). In support of its section 2-619 motion, Corbis submitted the affidavit of its senior corporate counsel, Dave Green. Green testified that Corbis is in the business of licensing copyrights for photographs and other artistic images. Corbis either owns the copyrights to those images or is authorized to license the copyright to those images on behalf of photographers and artists whom Corbis represents and to whom Corbis pays royalties. Corbis displays a catalogue of over 2.1 million photographic images it owns on its website so that customers can identify the images they choose to license. The photographs shown on the site are either obscured with a visible watermark or are a very low resolution in order to prevent use of the images by customers prior to the execution of copyright licenses.

Green stated that Corbis's pricing for copyright licensing depends on the extent of the customer's proposed use and that Corbis charges a newspaper with a greater circulation a higher

---

James Brown died.

[3]Brown alleged that six other defendants used his voice and likeness for the sale or promotion of merchandise such as phone cards and posters. No such allegations were made against Corbis.

fee for a copyright license than it charges a newspaper with a smaller circulation because of the "more intensive" use of the copyrighted work.

Green continued that Corbis never used images of Brown to sell or advertise any "product, merchandise, goods, or services" as required for application of the Publicity Act nor does Corbis sell images of Brown. Rather, Corbis only offers to license certain rights under federal copyright law, subject to the terms and conditions stated in Corbis's site agreement and in Corbis's licensing agreements.

In addition, Corbis notifies users of its website that Corbis does not own or license rights of publicity. The photographs of Brown at issue in this case are found in the "professional use" section of Corbis's Web site and are designated as "rights managed" images, which contain restrictions such as conditioning the licensee's right to use the images upon obtaining all necessary third-party "rights, releases and permissions."

Brown did not file any counteraffidavit.

On August 6, 2003, the trial court denied Corbis's motion to dismiss counts III and VI pursuant to section 2-615, but granted the motion pursuant to section 2-619. The trial court held that Corbis's actions as a "vehicle of information" are noncommercial and therefore Brown has no actionable right of publicity either under common law or the Publicity Act. In addition, the trial court held that Corbis's rights under the federal Copyright Act of 1976 (Copyright Act) (17 U.S.C.§ 101, *et seq*. (2000)), prevents any claim Brown might have based on his right of publicity. The trial court held that Brown's right of publicity is equivalent to one of the rights specified in section 106 of the Copyright Act and gives the copyright holder, Corbis, the sole right to distribute images of Brown.

However, on July 23, 2004, upon Brown's motion for reconsideration, the trial court completely reversed it's initial holding. The trial court, recognizing that it previously held that Corbis was exempt from liability for violating Brown's right of publicity as a "vehicle of information," determined that it had previously erred in applying the law, and reasoned that the exception applied only if the images sold by Corbis are used for the purpose of disseminating news or other public interest information. The trial court held that in light of the fact that Corbis sells pictures to various categories of customers, some of whom are not news media but, rather, private or commercial users, Brown's right of publicity is at issue. The trial court further held that Corbis may be liable either directly or indirectly of "turning a blind eye" to possible copyright infringements.

On September 17, 2004, Corbis filed its motion to reconsider the trial court's order of July 23, 2004. Corbis also moved to certify three questions of law for interlocutory appeal pursuant to Supreme Court Rule 308. On March 22, the trial court denied Corbis's motion for reconsideration and certified the two questions noted above on appeal to this court.

OPINION

I. Preliminary Matters

During oral arguments on this case, the court took judicial notice of the intervening event of the death of plaintiff James Brown on December 25, 2006, subsequent to the filing of the parties' briefs but prior to oral arguments. This court queried the parties whether the plaintiffs had filed or intended to file a suggestion of death with this court. Plaintiffs' attorneys indicated that a suggestion-of-death filing would be made only in the trial court. Following oral arguments, this court *sua sponte* invited the plaintiffs to provide information regarding the status of the estate of James Brown and any change in representation that would impact our ability to

issue an opinion in this case. Over a period of six months, the representatives of James Brown provided piecemeal answers to the inquiries of this court  The following is the chronology of the orders of this court, along with the responses provided by the parties:

January 25, 2007:     At the outset of oral arguments, this court requests that plaintiffs file a suggestion of death with this court.

February 2, 2007:     Plaintiffs, James Brown and others, file motion to suggest the death of James Brown, attaching Brown's death certificate, and to substitute three personal representatives,  Alfred H. Bradley, Albert H. Dallas and David G. Cannon, as representatives of the Estate of James Brown.  This motion is filed concurrently with the order of this court, dated February, 6, 2007.

February 6, 2007:     This court issues an order, *sua sponte*, requesting that James Brown inform the court regarding:  (1) the substitution of parties; (2) the suggestion of death; (3) any change in representation; and (4) any change in the standing of the parties.

April 12, 2007:     This court issues a second order deeming plaintiff's motion filed February 2, 2007, insufficient to supply the information this court  requested. The order requested that the party representing James Brown provide the following information:  (1) status of the decedent's estate; the location and name of the probate court; and the location and name of executor, administrator, or representative of the estate; (2) whether the designee or representative desires leave to file an appeal brief; and (3) status as to the party's authority to continue to prosecute the appeal or whether it is necessary to substitute a party.

May 15, 2007:     Plaintiffs file a status report. The report is signed by the three personal representatives and indicates that all three representatives desire that the appeal go forward. The representatives do not ask for leave to file an appeal brief and seek only to substitute as personal representatives of the Estate of James Brown.

May 21, 2007:     Plaintiffs file a motion to supplement the previously filed status report. Attached to the motion to supplement is an order of the probate court of the State of South Carolina, County of Aiken, in the matter of James Brown, a/k/a James Joseph Brown, No. 2007-ES02-0056, appointing the three personal representatives.

June 1, 2007:     Defendant Corbis files a detailed response to plaintiffs' status report, indicating that plaintiffs' omitted pertinent information from the report and attaching several news articles from the Augusta (Georgia) Chronicle.[4]

June 27, 2007:     Plaintiffs file a motion to further supplement the May 15, 2007, status report, including a document entitled "Authorization of Special Adminis- trators," but without any caption indicating that it constitutes a formal court filing, as well as a multiply-faxed copy of an attorney client agreement purportedly signed by James Brown with the law firm of Gold & Coulsen.

---

[4]The Augusta Chronicle, Brown's hometown paper, continues to meticulously report on the death of James Brown and the legal battles surrounding his estate.

The news articles from the Augusta (Georgia) Chronicle submitted by Corbis reported that, in addition to three representatives, two additional individuals, Adele Pope and Bob Buchman, were appointed as special administrators of the Estate of James Brown. The special administrators were described as being charged with overseeing the actions of the personal representatives.

In their supplemental motion filed June 27, 2007, plaintiffs stated that Aiken County, South Carolina, probate judge, Sue H. Roe, appointed Alfred H. Bradley, Albert H. Dallas and David G. Cannon personal representatives of the Estate of James Brown on January 18, 2007. These three individuals, who purportedly serve as both court-appointed personal representatives and cotrustees of the James Brown Irrevocable Trust, later expressed their desire to substitute as plaintiffs for James Brown, via an "Authorization of Special Administrators" authorizing Gold & Coulson and Jay B. Ross to continue to represent the Estate of James Brown. The special administrators also authorize themselves to substitute as party plaintiffs in any existing litigation or future litigation related to the Estate of James Brown.

While the representatives provided the authorization of the personal administrators, it remains unclear whether all of the necessary parties have filed appearances in this case. One of the trusts created upon the death of James Brown, the "I Feel Good" Trust, reportedly has the rights to Brown's music, likeness and image and is not named as a party plaintiff. The "I Feel Good" Trust was apparently created by an irrevocable trust agreement signed August 1, 2000. The three personal administrators seek to substitute as plaintiffs in their capacity as both personal representatives of the Estate and as cotrustees of the James Brown Irrevocable Trust. However, plaintiffs failed to submit to this court either the trust agreement or the order of the South Carolina probate court appointing the special administrators.

Plaintiffs' responses, detailed above, while incomplete, do not appear to alter the posture of the parties in terms of this court's ability to answer the questions certified to this court. This court is not a finder of fact. Therefore, any issue regarding proper plaintiffs or their representation is a matter that is best resolved in the trial court.

## II. Certified Questions

This appeal is pursuant to Illinois Supreme Court Rule 308, which authorizes courts to certify questions for interlocutory appeal. Section (a) provides in pertinent part:

> "When the trial court, in making an interlocutory order not
> otherwise appealable, finds that the order involves a question of
> law as to which there is substantial ground for difference of
> opinion and that an immediate appeal from the order may
> materially advance the ultimate termination of the litigation, the
> court shall so state in writing, identifying the question of law
> involved. Such a statement may be made at the time of the entry of
> the order or thereafter on the court's own motion or on motion of
> any party." 155 Ill. 2d R. 308(a).

The Supreme Court also authorizes the court to stay the proceedings pending resolution of the interlocutory appeal. 155 Ill. 2d R. 308(e).

## A.

Initially, Corbis contends that the trial court erred in holding that its Web site display of copyrighted images of James Brown constitutes a commercial purpose under the Publicity Act, which codifies the common law right of publicity. We review questions of statutory

interpretation *de novo*, as they present pure questions of law.  Knauerhaze v. Nelson, 361 Ill. App. 3d 538, 563-64, 836 N.E.2d 640 (2005).

In counts III and VI of his complaint, Brown seeks damages and other relief for the Web site display of his images on the Corbis Web site without his consent, even when Corbis's customers do not use the photographs for a commercial purpose.  Corbis argues that Brown's allegations are premised on an unprecedented legal theory that a copyright for a photograph of an individual cannot be licensed unless the publicity rights are obtained by the licensor, not the end user, without regard to the ultimate use of the photograph.

Count III alleges infringement on Brown's common law right and statutory right of publicity.  The Publicity Act, effective January 1, 1999, essentially codifies the common law right of publicity and provides in pertinent part:

> "The right to control and to choose whether and how to use
>
> an individual's identity for commercial purposes is recognized as
>
> each individual's right of publicity."  765 ILCS 1075/10 (West
>
> 2002).

Corbis explains that the common law right of publicity is derived from the right to privacy.  This court first recognized that the common law right to privacy extended to a right of publicity in Eick v. Perk Dog Food Co., 347 Ill. App. 293, 106 N.E.2d 742 (1952).  The right of publicity is "designed to protect a person from having his name or image used for commercial purposes without consent."  Dwyer v. American Express Co., 273 Ill. App. 3d 742, 748, 652 N.E.2d 1351, 1355 (1995).

Citing cases decided prior to the enactment of the Publicity Act, Corbis argues that Illinois courts have narrowly construed the right of publicity, however, to avoid infringing upon

first amendment rights and other important public interests. For example, in Leopold v. Levin, 45 Ill. 2d 434, 441, 259 N.E.2d 250, 254 (1970), our supreme court held that convicted murderer Nathan Leopold of the infamous duo "Leopold and Loeb" failed to establish a violation of right of publicity in a fictionalized account of his life in book and movie because his crime and prosecution in 1924 "remain an American *cause celèbre*," and because of his "consequent and continuing status as a public figure." Leopold, 45 Ill. 2d at 441. The court explained: " '[The fact] [t]hat books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment. We fail to see why operation for profit should have any different effect in the case of motion pictures.'" Leopold, 45 Ill. 2d at 441-42, quoting Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02, 96 L. Ed. 1098, 1106, 72 S. Ct. 777, 780 (1952). Corbis further cites Berkos v. National Broadcasting Co., 161 Ill. App. 3d 476, 495, 515 N.E.2d 668, 679 (1987), as a case similar to the present case. There, the plaintiff, a Cook County circuit court judge, filed claims for libel and commercial appropriation and intentional infliction of emotional distress against NBC based on a television news segment that reported on a federal criminal investigation known as "Operation Greylord." The news reporters referred to the plaintiff in his judicial capacity and showed his likeness on the program. The trial court dismissed the plaintiff's entire complaint and subsequent motions to reconsider and amend the complaint. This court reversed the trial court's finding regarding the plaintiff's libel claim (Judge Jiganti dissenting), but affirmed the dismissal of plaintiff's complaint for improper commercial use of his likeness. Citing Leopold, the court found that Berkos' photograph in the broadcast was "part of a 'vehicle of information' such as the news media." Berkos, 161 Ill. App. 3d at 495, citing Leopold, 45 Ill. 2d 434.

Brown responds that the trial court properly concluded that Corbis's display of his photos on its Web site did not constitute a part of a "vehicle of information" similar to a news report because Corbis sells the photos for commercial purposes as a merchandise or good, which is prohibited by the Publicity Act:

" 'Commercial purpose' means the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services *** ."  765 ILCS 1075/5 (West 2002).

In support, Brown cites Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387, 21 P.3d 797, 106 Cal. Rptr. 2d 130 (2001).  There, the registered owner of all rights to the Three Stooges sought damages and injunctive relief against an artist for violation of California's publicity rights act based on the artist's sale of lithographs and T-shirts bearing the likenesses of Moe, Curly and Larry reproduced from a charcoal drawing.  The court held that the artist was prohibited from depicting the Three Stooges "on or in products, merchandise, or goods" within the meaning of the publicity rights statute without the consent of the registered owner.  Comedy III, 25 Cal. 4th at 395, 21 P.3d at 802, 106 Cal. Rptr. at 132 .[5]

Corbis distinguishes Comedy III, arguing that that case dealt with tangible property, *i.e.*, the display of the Three Stooges on T-shirts and lithographs.  Corbis argues that it is not selling tangible property but is only transferring a legal right created by the Copyright Act.  Corbis

---

[5]In its complaint, Brown notes that Corbis has licensing agreements with the registered owners/estates of Marilyn Monroe and James Dean.

quotes Comedy III: "[W]e agree with the Court of Appeal that Saderup sold more than just the incorporeal likeness of The Three Stooges. Saderup's lithographic prints *** are themselves tangible personal property, consisting of paper and ink, made as products to be sold and displayed on walls like similar graphic art." Comedy III, 25 Cal. 4th at 395, 21 P.3d at 802, 106 Cal. Rptr. at 132. Corbis responds that the licenses it grants for Brown's "incorporeal image" are purely intangible.

Corbis concludes that the trial court's ruling conflicts with the first amendment: Brown cannot require payment for the news media's use of his image. The Publicity Act specifically exempts "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." 765 ILCS 1075/35(b)(2) (West 2002). By way of example, Corbis notes that it recently licensed several images of Brown to Rolling Stone Magazine, which published a lengthy biographical news article about Brown. Jonathan Lethem, Being James Brown, Rolling Stone, June 29, 2006, at 5, 55-64, 80-81. Corbis argues that had it not been able to license these images of Brown, the news media would have been impermissibly censored.

The parties' arguments are all compelling. However, whether the facts as alleged support Brown's action for a violation of the Publicity Act depends on how Corbis's actions are defined. In this case of "apples v. oranges," Corbis argues that in displaying photographs of James Brown on its Web site, it is *not selling a product* but rather *offering to license the copyrights* it holds on the photographs. Corbis argues that any action by Brown for improper use of the photos by the end user licensee lies against that end user and not Corbis.

The amicus party, the industry group Archive Council of America (ACA), opines that neither the Publicity Act nor the common law prohibits stock photo libraries and copyright

13

owners from offering unreleased images to commercial users and cannot be liable for the action of the end users: the failure of end users to obtain subsequent clearances in the use of an image does not convert the licensor into an infringer. See Medic Alert Foundation United States, Inc. v. Corel Corp., 43 F. Supp. 2d 933, 940 (N.D. Ill. 1999). ACA argues that 19 states have right-of-publicity statutes, 18 have a recognized common law right of publicity and no state has ever held that the mere display of images for the purpose of licensing copyrights violates a right of publicity in and of itself: "Overprotecting intellectual property is as harmful as underprotecting it," and "[T]he broader and more ill-defined one state's right of publicity, the more it interferes with the legitimate interests of other states." White v. Samsung Electronics America, Inc., 989 F.2d 1513, 1519 (9th Cir. 1993) (Kozinski, O' Scannlain, and Kleinfeld, J.J., dissenting from denial of rehearing *en banc*); J. Thomas McCarthy, The Rights of Publicity and Privacy, §§6:3, 6:6 (2d ed. 2005). The ACA warns of the evanescence of public access to historic photographs.

The trial court initially concluded that Corbis's "sale" of the licenses was noncommercial and constituted a "service." However, in reversing itself, it concluded that Corbis was, in fact, selling a "product" for profit and that since Brown received no compensation from any potential unauthorized commercial use, his rights of publicity are violated.

When proceeding under a section 2-619 motion, the movant concedes all well-pleaded facts set forth in the complaint but does not admit conclusions of law. Employers Mutual Cos. v. Skilling, 256 Ill. App. 3d 567, 569, 629 N.E.2d 1145 (1994). A section 2-619 motion should be granted only when it raises an affirmative matter, which negates the plaintiff's cause of action completely or refutes critical conclusions of law or conclusions of material, but unsupported fact. The court must deny the motion if there is a material and genuine disputed question of fact. 735

ILCS 5/2-619(c) (West 2002); Samansky v. Rush-Presbyterian-St. Luke's Medical Center, 208 Ill. App. 3d 377, 383, 567 N.E.2d 386 (1990).

In light of the vast difference of opinion regarding the interpretation of the definition of what Corbis sells and the legal effect of such sales, we cannot say that the facts are undisputed that Corbis's display of the photos of James Brown on its Web site did not in some way constitute an improper commercial use under either the Illinois common law or the Publicity Act. We therefore cannot conclude that the trial court erred in denying Corbis's motion to dismiss.

For this reason, we answer the first certified question in the negative.

B.

Next, Corbis contends that the trial court's interpretation of the Publicity Act and the common law right of publicity violates the copyright clause of the United States Constitution, which provides that: "Congress shall have the Power * * * To promote the Progress of Science and Useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, §8, cl. 8. Corbis argues that it merely exercises its rights to reproduce and publish Brown's images under the Copyright Act and that any publicity rights held by Brown are preempted by the Copyright Act. Corbis explains that the trial court's ruling allows Illinois to regulate the subject matter of copyright and to limit or even eliminate the exclusive rights granted to copyright holders under section 106 of the Copyright Act.

Section 301 of the Copyright Act outlines two conditions which, if met, require the preemption of a state-law claim in favor of the rights and remedies available under federal law. Section 301(a) states:

"On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section[] 102 *** are governed exclusively by the title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301(a) (2000).

In making its determination, the trial court framed this case as one of first impression and relied on Toney v. L'Oreal USA, Inc., 406 F.3d 905 (7th Cir. 2005). There, a model consented to the use of her photograph for a limited time in connection with the packaging of a hair care. However, when a successor company later used her photograph without her permission, Toney filed an action under the Publicity Act alleging that her right of publicity had been violated. The Seventh Circuit held that Toney's claim survived preemption by the Copyright Act. The court determined that the subject matter of a Publicity Act claim is not a particular picture or photograph but, rather, the "persona of the plaintiff as a human being." Toney, 406 F.3d at 908. The court found that Toney's identity was not "fixed in a tangible medium of expression" and that the rights protected by the Publicity Act are not "equivalent" to any of the exclusive rights within the general scope of section 106 of the Copyright Act. Toney, 406 F.3d at 909. Thus, Toney's *identity* was not protected by copyright law and the state law protecting her rights was not preempted.

16

Corbis, however, asserts that the subject matter of Brown's Publicity Act claims--the offering to license and the actual licensing of copyrights to photos of James Brown--does in fact fall within the subject matter of copyright. In support, Corbis relies on <u>Laws v. Sony Music Entertainment, Inc.</u>, 448 F.3d 1134 (9th Cir. 2006). There, the defendant, Sony Music, obtained a license to use a vocal recording of the song "Very Special," as performed by Debra Laws. Sony used a sample of the recording in a compact disc (CD) and music video featuring another artist. Sony earned substantial revenue from the sales of the CD and video without obtaining Laws' consent to use the recording. Law brought the action alleging that Sony's use of the sample recording violated her statutory and common law rights of publicity under California law. <u>Laws</u>, 448 F.3d at 1138. In response, Sony argued that Laws' specific claims could not be distinguished because Laws' right of publicity was based solely on her voice "embodied within a copyrighted sound recording." <u>Laws</u>, 448 F.3d at 1139.

The Ninth Circuit found in favor of Sony, holding that the two rights, the copyright and Laws' right of publicity, could not be separated. The Ninth Circuit distinguished <u>Toney</u>, noting that in that case, the plaintiff claimed misappropriation of her identity *separate and apart* from any copyrighted work. <u>Laws</u>, 448 F.3d at 1142.

Corbis compares the present case to <u>Laws</u> and distinguishes it from <u>Toney</u> arguing that Brown's likeness does not extend beyond the use of the copyrighted photos themselves. In <u>Toney</u>, the defendant used a copyrighted photo to endorse a product. By contrast, Corbis is using a copyrighted photo to distribute a license. Corbis argues that Brown has not asserted a right of publicity claim separate from the enumerated rights under section 106 of the Copyright Act and that his claim is a direct challenge to Corbis's right to control the distribution and display of the copyrighted images.

Brown responds that Corbis argues a distinction without a difference. Brown argues that the images of James Brown advertised for sale on Corbis's Web site do, in fact, constitute fixed work on the Internet in that the "licenses" result in a tangible photograph to the end user. Brown distinguishes Laws, noting that there, the plaintiff had contractually released control and copyright of her recording to Sony. Laws, 448 F.3d at 1136. By contrast, Brown never consented to any sale of his photographs and never possessed control of a copyright interest to release.

Under the circumstances, where it is possible that the photos as displayed on Corbis's Internet Web page can be interpreted as tangible, the Publicity Act as applied here would not preempt copyrights. As such, we answer the second question certified to this court in the negative.

In conclusion, we answer the trial court's certified questions in the negative and hold that (1) the trial court did not err in denying Corbis's motion to dismiss counts III and VI of plaintiffs' complaint under the Publicity Act; and (2) the United States Copyright Act does not preempt plaintiffs' claims. We therefore affirm the orders of the trial court and remand this matter for further proceedings consistent with this opinion.

Affirmed.

QUINN, P.J., and MURPHY, J., concur.