MEMORANDUM OPINION
 

 KOCORAS, District Judge:
 

 The plaintiff, James R. Cantrell, filed this action to recover actual and punitive damages from American Broadcasting Companies, Inc. and from two of ABC’s employees, Geraldo Rivera and Peter Lance. The complaint alleges that the plaintiff suffered injury to his reputation because of a nationally televised broadcast on February 7, 1980 of ABC’s program entitled “Newsmagazine 20/20.” The segment at issue was entitled “Arson and Profit,” which was narrated by Mr. Rivera and produced by Mr. Lance. Both Rivera and Lance were investigative reporters who took part in the preparation of the segment. Defendants move to dismiss the complaint pursuant to Rule 12(b)(6), F.R.Civ.P., on the ground that it fails to state a cause of action for libel and for invasion of privacy. This court has reviewed both a transcript and a videotape of the broadcast.
 

 The 20/20 segment on “Arson and Profit” concerned an investigation of an alleged arson-for-profit conspiracy involving a group of real estate owners and their associates who operated in the Uptown neighborhood of Chicago, Illinois. In the first minute of the program, an announcer states that in many cases arson causes some people to get rich while others lose their homes or lives. He then declares that “20/20’s hidden camera shows you the tricks of the trade.”
 

 After the introduction to the program is given by Mr. Hugh Downs, Geraldo Rivera delivers his opening paragraph:
 

 Because it’s so difficult to catch someone in the act of actually trying to set fire to a building, the courts allow circumstantial evidence to prove who committed the crime. Well, in this investigation by 20/20 and Chicago’s Better Government Association, we believe we’ve uncovered some extraordinary circumstantial evidence. Evidence that a small group of Uptown Chicago businessmen are making money as their buildings burn and as their tenants die. This is a report on “Arson and Profit.”
 

 Mr. Rivera then reviews a fire in the Uptown community which had apparently been caused by an arsonist seeking revenge on a tenant. (Tr. 3). Immediately after-wards, Rivera states that there is another type of intentional fire caused by arson for profit, which is “what the rest of the report is all about.” (Tr. 3).
 

 Four examples of such fires caused by arson for profit are given, and mention is made for the first time of a three alarm blaze on December 29, 1979 that killed seven people. (Tr. 3). It is this fire that primarily concerns the plaintiff. According to Rivera, all of these buildings “were
 
 *743
 
 owned or controlled by a tightly-knit group of people” and “all of them were heavily insured at the time of the fire.” (Tr. 4). In establishing that the buildings were owned by the same group of people, ABC interviewed Slim Coleman of the Uptown People’s Center. According to Coleman, “the title searches showed that even though they tried to cover it up, that they were the same group of men behind all of the buildings.” (Tr. 4). According to Barbara Klein, an attorney for the BGA, this same group of men owned at least twenty nine buildings, all of which had serious fires and were heavily insured. (Tr. 5).
 

 Rivera reported that ABC News began to investigate “this group of building owners and their associates” in November of 1979. (Tr. 6). Producer Peter Lance posed as a real estate developer and had “more than ten meetings with these men” over the next two months. Two men, who are shown walking together outdoors, are identified as “the two principal members of the group.” (Tr. 6). One of them is “John Schmiegal, owner of several transient hotels”; the other is “Charles Roberts, a notorious Uptown slum lord.” (Tr. 6). Shortly after they are shown, Rivera reports:
 

 While Roberts and Schmiegal are the main characters in this story, they haven’t acted alone. There is also a supporting cast.
 

 [A view of Cedar Realty’s office is then shown on the screen.]
 

 This is Cedar Realty, a brokerage firm which lists a number of Uptown Chicago properties. The principal broker at Cedar is Albert LaBunski. (Tr. 6).
 

 After other parties are shown, including the agent who allegedly wrote the insurance policies for the Roberts group, Rivera asks the viewing audience to consider “Exhibit A”, which is the Ellis Hotel. (Tr. 7). Two people died in a four alarm fire in that building on February 19, 1979. That was the sixth fire in the hotel since the Roberts group had taken control of it in 1968. According to Rivera, a check was issued in the amount of $145,000 for the Ellis Hotel fire to John Schmiegal, his wife, and Charles Roberts “among others.” (Tr. 8). That insurance payment was allegedly the twenty eighth received by Schmiegal and associates in the last six years. (Tr. 8).
 

 Having reviewed two other cases of fire in buildings owned by the Roberts group, Rivera discussed the fire on December 29, 1979 which killed seven people in the Malden Park Apartments. (Tr. 9). Specifically, Rivera stated:
 

 According to first reports, the fire was caused by a tenant cooking in his room. But ABC News assembled a special fire investigation team to pinpoint the actual cause of the blaze.
 

 What the fire investigation team uncovered is sharply different from the original police findings. You’ll learn what we learned about the fire that left seven people dead, and about the people who may have been responsible when this Special 20/20 Report continues after this: (Tr. 9).
 

 After the commercial break, Rivera described the Malden Park Apartments fire in detail and noted that it was another building owned by “Charles Roberts and his associates.” At this point in the program, the plaintiff was mentioned for the first time:
 

 James Cantrell is an employee of Cedar Realty, and he’s no stranger to fires in Uptown. He worked at the Ellis Hotel just before it burned last year, and was the manager of the Malden Park Apartments when the fire broke out in December. At the time Cantrell blamed the fire on a resident cooking in his fourth floor room. (Tr. 9).
 

 James Cantrell was then shown on the screen and asked about the cause of the fire. He said that the tenant had three pots on the stove and that the burners were “turned wide open.” (Tr. 10). Rivera immediately inquired:
 

 Was it an accidental fire caused by a careless tenant cooking, as James Cantrell, the building manager contends? Or was this a case of arson? (Tr. 10).
 

 Larry Schreiner, a fire inspector, was interviewed and stated that in his opinion the fire started below the fourth floor. Mr.
 
 *744
 
 Schreiner was shown inspecting the rear stairwell of the building.
 

 Rivera reported that ABC News had samples of the stair beams tested at Pan-Tecnick Laboratories. The results of the tests indicated that the wood stair beams contained gasoline. At this point, Rivera stated:
 

 Let’s review. Our evidence concludes that the fire was started by gasoline in the lower rear stairwell. But building manager Cantrell continues to insist that it was caused by a fourth-floor cooking accident. And as the conversation you’re about to witness indicates, James Cantrell apparently views himself as an expert when it comes to apartment building fires.
 

 In fact two weeks before the fatal Malden fire, he [plaintiff] met with 20/20 Producer Peter Lance, who was continuing in his undercover role as a real estate developer. We filmed their conversation from this van, using one-way glass and a hidden camera. During the course of the conversation Cantrell actually instructed Lance on how to get the most insurance money from an arson fire. He told Lance it was good to have a basement fire because that way you can collect for smoke damage for the entire building. But he went on to say that a fire on the top floor is even better because then you get paid for water damage as well. (Tr. 11).
 

 During the foregoing narration, the plaintiff was shown walking to a car with Lance, getting into the car, and then speaking to Lance inside the car.
 

 As soon as Rivera had described the conversation between Lance and Cantrell, Rivera and Lance were filmed in the following interview with the plaintiff:
 

 On January 9th, we confronted Mr. Cantrell:
 

 RIVERA: See this man right here, [referring to Lance],
 

 CANTRELL: Yes sir.
 

 RIVERA: Do you recall any conversation with him concerning how to set fires, deliberately set fires?
 

 CANTRELL: No, I. . . had talked to him before.
 

 LANCE: (loudly) Didn’t you say to me, Now if you set a fire on the top floor, you can collect for water damage below; and if you set a fire in the basement, you can collect smoke damage, (shouting) Didn’t you say that?
 

 CANTRELL: Yeah, that we talked
 

 about.
 

 LANCE: You did?
 

 CANTRELL: That we talked about. No, no . . . not in that . . . just same words, but that we talked about.
 

 RIVERA: Why would you talk about that? Why would you talk about committing a crime to deliberately defraud an insurance company?
 

 CANTRELL: I wasn’t committin . . . talking about ... I wasn’t. He was asking me about the buildings here in Chicago, and how the system works here. And I explained the system. Am I right? LANCE: How did you learn about the system, Jim?
 

 CANTRELL: Because I used to own buildings. Any . . . any manager or any owners could tell you.. .
 

 RIVERA: Did you burn your buildings? CANTRELL: No siree.
 

 RIVERA: Then how did you know? CANTRELL: I got out of the system. (Tr. 11-12).
 

 This court notes that Cantrell gave the impression that he was somewhat perplexed during the foregoing exchange, which was the last time that Cantrell was mentioned by name or shown during the program.
 

 After the interview with the plaintiff had been shown, Rivera said that ABC News had learned that “Charles Roberts and his associates stood to benefit from this tragic fire.” (Tr. 12). While he was explaining how the insurance payment for the Malden Park apartment building averted an imminent mortgage foreclosure, the office of Cedar Realty was shown on the screen with Mr. LaBunski clearly visible inside. A minute later, Rivera asked how an insurance program financed by the government, which was the apparent source of the cover
 
 *745
 
 age, could be so generous. (Tr. 13). In order to discover the answer, Peter Lance “went to Cedar Realty, broker for the Roberts group.” (Tr. 13). For the next few minutes, the program indicated that Cedar Realty found an abandoned building for Mr. Lance to purchase that was readily susceptible to arson and vandalism, and that Cedar Realty referred Lance to an inspector for the government in procuring the necessary coverage.
 

 Rivera noted that the total amount of all insurance claims paid to the Roberts group since 1974 was $565,000. (Tr. 17). In a building owned by the Roberts group, a fire allegedly breaks out on the average of once every nine months. Towards the end of the segment, Rivera declares:
 

 Bear in mind that the evidence we presented tonight was uncovered not by law enforcement officials in Chicago; but by a dedicated team of young lawyers and investigators from the Better Government Association. In turning up evidence of an arson for profit scheme, they accomplished what the U.S. Attorney and three successive Chicago mayors could not. (Tr. 18).
 

 Shortly thereafter, Rivera refers to one of the victims of the fire at the Malden Park Apartments. The victim’s daughter, who is shown in tears, reacts indignantly to the presumption that arson for profit caused her father’s death. (Tr. 19). In conclusion, Rivera announces that ABC received the “final report on the Malden Park fire from Pan-Technic labs, one of the nation’s leading fire analysts,” and that the laboratory is convinced that the fire was caused by arson because gasoline was found in several parts of the building. (Tr. 19). In his final colloquy with Rivera, Mr. Downs asks why the police have been unable to discover the “compelling evidence” which Rivera and the other parties had found. (Tr. 19).
 

 I.
 
 Libel
 

 Counts I, II, and III of the complaint allege that ABC, Mr. Rivera, and Mr. Lance made the following seven statements about the plaintiff:
 

 1) RIVERA: “While Roberts and Schmiegal are the main characters, they haven’t acted alone. There is also a supporting cast.”
 

 2) RIVERA: “James Cantrell is an employee of Cedar Realty, and he’s no stranger to fires in Uptown.”
 

 3) RIVERA: “Let’s review. Our evidence concludes that the fire was started by gasoline in the lower rear stairwell. But building manager Cantrell continues to insist that it was caused by a fourth-floor cooking accident. And as the conversation you’re about to witness indicates, James Cantrell apparently views himself as an expert when it comes to apartment building fires.”
 

 4) RIVERA: “We filmed their conversation from this van, using one-way glass and a hidden camera. During the course of the conversation, Cantrell actually instructed Lance on how to get the most insurance money from an arson fire.”
 

 5) RIVERA: (to Cantrell) “Do you recall any conversation with him concerning how to set fires, deliberately set fires?”
 

 6) LANCE: (to Cantrell) “Didn’t you say to me, ‘Now if you set a fire on the top floor, you can collect for water damage below, and if you set a fire in the basement, you can collect smoke damage.’ Didn’t you say that?”
 

 7) RIVERA: (to Cantrell) “Why would you talk about that? Why would you talk about committing a crime to deliberately defraud an insurance company?”
 

 Plaintiff alleges that the foregoing statements were false, malicious and defamatory, and that they depicted plaintiff as an arsonist, murderer, and member of a group of individuals engaged in a conspiracy to commit the crimes of arson and insurance fraud. Defendants contend that the statements are not defamatory under the law of Illinois, which applies to this case based
 
 *746
 
 upon diversity jurisdiction.
 
 Fleck Bros. Co. v. Sullivan,
 
 385 F.2d 223 (7th Cir. 1967).
 

 Defamatory statements are classified either as libel per se or per quod. Libel per se is generally defined as words so obviously and naturally hurtful to the aggrieved person that proof of their injurious character is unnecessary.
 
 Newell v. Field Enterprises, Inc.,
 
 91 Ill.App.3d 735, 741, 47 Ill.Dec. 429, 436, 415 N.E.2d 434, 441 (1980). Over the years, the Illinois courts have discerned four categories of words which constitute libel per se: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a communicable disease which, if true, would tend to exclude one from society; (3) those imputing inability to perform or want of integrity in the discharge of duties of office or employment; and (4) those prejudicing a particular party in his profession or trade.
 
 Id.
 
 91 Ill.App.3d at 741, 47 Ill.Dec. at 436, 415 N.E.2d at 441. It is apparent from the complaint that this Court need only consider the first category for purposes of defendants’ motion. Further, both parties appear to agree that resolution of the motion depends upon whether the defendants have imputed the commission of a crime to the plaintiff.
 

 It is well established that in determining whether the challenged language falls within one of the categories of libel per se the Illinois courts follow the “rule of innocent construction.”
 
 Levinson v. Time, Inc.,
 
 89 Ill.App.3d 338, 341, 44 Ill.Dec. 752, 755, 411 N.E.2d 1118, 1121 (1980);
 
 Makis v. Area Publications Corp.,
 
 77 Ill.App.3d 452, 456, 32 Ill.Dec. 804, 807; 395 N.E.2d 1185, 1188 (1979). In
 
 John v. Tribune Co.,
 
 24 Ill.2d 437, 442, 181 N.E.2d 105, 108,
 
 cert. den.
 
 371 U.S. 877, 83 S.Ct. 148, 9 L.Ed.2d 114, the Illinois Supreme Court defined the innocent construction rule:
 

 That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law.
 

 The rule requires that the meaning of a statement be gathered not only from the words singled out, but from the context.
 
 Bravo Realty, Inc. v. C.B.S., Inc.,
 
 84 Ill.App.3d 862, 865, 40 Ill.Dec. 360, 363, 406 N.E.2d 61, 64 (1980);
 
 Sloan v. Hatton,
 
 66 Ill.App.3d 41, 43, 22 Ill.Dec. 783, 785, 383 N.E.2d 259, 261 (1978). The surrounding circumstances and the events that led to the utterance should be examined very closely and the words judged accordingly.
 
 Sloan
 
 v.
 
 Hatton, supra,
 
 66 Ill.App.3d at 43, 22 Ill.Dec. at 785, 383 N.E. at 261. For that reason, the proper legal approach to this problem is not to examine selected words or phrases, but rather to construe the seven statements underlying the libel claims in Counts I, II, and III as a whole within the context of the entire broadcast of the “Arson and Profit” segment.
 
 See, e.g., Levinson v. Time, Inc., supra,
 
 89 Ill.App.3d at 342, 44 Ill.Dec. at 756, 411 N.E.2d at 1122.
 

 Defendant argues that the first of the seven statements is not defamatory under the innocent construction rule because it does not refer to the plaintiff. Whether the statement was in fact understood by viewers to refer to plaintiff might ultimately be a question for the jury, but preliminary determination whether it is capable of being so understood is a question of law which must, upon the motion to dismiss in this case, be resolved in favor of the plaintiff.
 
 Troman v. Wood,
 
 62 Ill.2d 184, 189, 340 N.E.2d 292, 294 (1975). Defendants contend, however, that the innocent construction rule is applied not only to determine whether the words can be interpreted in a way which is nondefamatory, but also whether they can be construed in a way which does not relate them to the plaintiff.
 
 Bravo Realty, Inc. v. C.B.S., Inc., supra,
 
 84 Ill.App.3d at 865, 40 Ill.Dec. at 363, 406 N.E.2d at 64;
 
 Belmonte v. Rubin,
 
 68 Ill.App.3d 700, 25 Ill.Dec. 430, 386 N.E.2d 904 (1979). Under that principle, defendants claim that the first of the seven statements can be read in a way that does not refer to the plaintiff. Whether the first statement refers to plaintiff, just as whether each of the allegedly libelous remarks is capable of
 
 *747
 
 innocent construction, can only be determined within the context of the entire broadcast and the accompanying visual narrative.
 
 See Bravo Realty, Inc. v. C.B.S., Inc., supra.
 

 In his opening remarks, Mr. Rivera explained that the courts allow circumstantial evidence “to prove who committed the crime” of arson, and that the segment on 20/20 on “Arson and Profit” would portray “some extraordinary circumstantial evidence” that “a small group” of businessmen in Chicago were reaping profits while their buildings burned and their tenants died. (Tr. 2). Mr. Rivera’s introduction clearly suggests that the broadcast would effectively prove the commission of crimes by the group of Uptown businessmen through circumstantial evidence. After the fires at the Ellis Hotel and the Malden Park Apartments were first mentioned in the report, Rivera notes that all the buildings were owned or controlled by a tightly-knit group of people. (Tr. 4). The principal members of the group upon whom the report is focused are identified repeatedly as John . Schmiegal and Charles Roberts. (Tr. 6, 7, 8, 9, 12, 13, 15, 16,17). The segment unequivocally suggests that the so-called “Roberts group” was directly involved in numerous fires in buildings which they owned or controlled, and that those fires were caused by arson and in many cases killed tenants. As Miss Klein stated, the “same group of men” owned many buildings which had fires that resulted in substantial insurance payments. (Tr. 5).
 

 The broadcast indicated that Roberts and Schmiegal did not act alone and served only as the principal members of a larger group. (Tr. 6). According to the first of the seven statements underlying the libel claim, Rivera states that “there is also a supporting cast.” (Tr. 6). That comment is immediately followed by a visual shot of the office of Cedar Realty, which is subsequently identified as the principal real estate broker for the Roberts group. Clearly, Cedar Realty is portrayed as a member of the “supporting cast.” Mr. Albert LaBunski of Cedar Realty is identified as both the real estate broker and fire adjustor for Charles Roberts.
 

 In order to establish its suggestion that the Roberts group was behind many of the fires in the Uptown community, the program introduces its first “exhibit” as the Ellis Hotel fire on February 19, 1979. (Tr. 7). In effect, this is the first example of circumstantial evidence that would prove, as Mr. Rivera noted in his introductory statement, commission of crime. Rivera notes that the fatal fire of February 19th was the sixth since Roberts and his associates took control of the building in 1968. (Tr. 7). Further, a substantial insurance payment was made to Schmiegal and Roberts “among others” eight months after the fire had taken two lives in the building; Rivera notes that the Ellis insurance payment was the twenty eighth received by Schmiegal and his associates from the government insurance company over the preceding six years. (Tr. 8). An interview with a survivor of the fire leaves the unmistakable impression that it was caused by arson. (Tr. 7).
 

 Two other fires in buildings owned by the Roberts group are offered by Rivera as “Exhibits B and C.” In those cases, the government insurance program again issued checks to Roberts and associates. Rivera then describes the fire in the Malden Park Apartments as his fourth example of a building owned by the Roberts group where several people died. (Tr. 9). Although first reports stated that the fire was caused by a tenant cooking in his room, Rivera announces that 20/20’s own investigation of the incident uncovered evidence suggesting a different cause of the fire. (Tr. 9). Just before the commercial break, Rivera promises viewers that they will learn “about the people who may have been responsible” for the fire. (Tr. 9). The use of the words “may have been” is consistent with Rivera’s introductory remark that the program would present circumstantial rather than direct evidence to prove the commission of crime.
 

 James Cantrell is introduced immediately after Rivera promises to inform the viewer
 
 *748
 
 of those who may have been responsible for the Malden Park fire. He is described as an “employee of Cedar Realty”, which is identified throughout the broadcast as the principal real estate broker for the Roberts group, and as one who is “no stranger to fires in Uptown.” (Tr. 9). Rivera notes that Cantrell worked at the Ellis Hotel, which had been offered as “Exhibit A”, just before its fatal fire in 1979, and he is identified as manager of the Malden Park Apartments at the time of the fire that killed seven tenants. To a large extent, the circumstances surrounding the Malden Park fire serve as the principal focus for the remainder of the segment.
 

 Significantly, Rivera emphasizes that Cantrell blamed the fire on a resident cooking in this room. That is precisely the explanation that Rivera had said would be challenged by findings made by ABC News. (Tr. 9). After Cantrell is shown talking about the tenant who was cooking, Rivera states:
 

 Was it an accidental fire caused by a careless tenant cooking, as James Cantrell, the building manager contends? Or was this a case of arson? (Tr. 10).
 

 The purpose of the interview that follows with a fire inspector and of the Pan-Tecnick laboratory tests is to establish that arson was the cause, and to call Cantrell’s credibility into question. This is wholly consistent with the intent to show that Cantrell may have been responsible for the fire in some manner.
 

 In view of the foregoing sequence, the program suggests that Cantrell was linked to both the Roberts group and the Malden Park fire. That conclusion is confirmed by the confrontation that takes place on the screen between Lance, Rivera, and Cantrell. Rivera reports that Lance, when posing as a real estate developer, had a conversation two weeks before the Malden Park fire with Cantrell which had been filmed by a hidden camera. According to Rivera, “Cantrell actually instructed Lance on how to get the most insurance money from an arson fire.” (Tr. 11). Specifically, Cantrell told Lance of the relative insurance benefits of a fire that is set on the top floor as opposed to one set in the basement. At that point, Rivera states that he and Lance “confronted” Cantrell on January 9, 1980 with the interrogation that was transcribed in the first part of this opinion.
 

 Rivera initially asks Cantrell whether he recognizes Lance, who is standing beside him. (Tr. 11). Cantrell states that he remembers Lance, and Rivera asks the plaintiff whether he recalls any conversation with Lance “concerning how to set fires, deliberately set fires.” (Tr. 11). Cantrell, who appears to be puzzled, replies in the negative, but states that he had talked to Lance before. Lance then raises his voice, and with an accusatory manner, says “didn’t you say to me, now if you set a fire on the top floor, you can collect for water damage below; and if you set a fire in the basement, you can collect smoke damage?” Lance then shouts: “Didn’t you say that?” Cantrell replies affirmatively that they talked about that. At this point, Lance asks Cantrell to confirm his response, and Cantrell replies: “That we talked about. No, no . . . not in that . . . just same words, but that we talked about.” (Tr. 11). Rivera now intervenes by asking Cantrell why he “would talk about committing a crime to deliberately defraud an insurance company?” Now that the purpose of the interrogation becomes clear, Cantrell responds that he was not committing a crime, but that he was merely speaking to Lance about the “system” in Chicago. When asked how he knew about it, Cantrell replied that he used to own buildings and that any building owner would be familiar with that “system.” At this point, Rivera asks the question that has been the gist of the interview and to which the segment has been developing since the time when Rivera promised to reveal “who may have been responsible” for the Malden Park fire: “Did you burn your buildings?” Cantrell replies “No siree.” (Tr. 12).
 

 It is well established that to constitute libel per se the offensive accusation need not state the commission of crime in terms of art or with the particularity of an
 
 *749
 
 indictment.
 
 Zeinfeld v. Hayes Freight Lines, Inc.,
 
 41 Ill.2d 345, 348, 243 N.E.2d 217, 220 (1968);
 
 also see Catalano v. Pechous,
 
 83 Ill.2d 146, 157, 50 Ill.Dec. 242, 247, 419 N.E.2d 350, 355 (1980). In determining whether the broadcast constitutes libel per se as imputing the commission of a crime, the words must be taken in the sense which viewers of common and reasonable understanding would ascribe to them and must be construed in the context of the entire broadcast.
 
 See, e.g., Newell v. Field Enterprises, Inc., supra,
 
 91 Ill.App.3d at 742, 47 Ill.Dec. at 436, 415 N.E.2d at 441. For words imputing the commission of a crime to be libelous per se, the offense must be indictable, involve moral turpitude, and be punishable by incarceration rather than by fine.
 
 Id.
 
 91 Ill.App.3d at 742, 47 Ill.Dec. at 436, 415 N.E.2d at 441. Further, whether language is susceptible of an innocent construction is a question of law for the court, and must be resolved by reading the language “stripped of innuendo.”
 
 Zeinfeld v. Hayes Freight Lines, Inc., supra,
 
 41 Ill.2d at 347, 243 N.E.2d at 220;
 
 John v. Tribune Co., supra,
 
 24 Ill.2d at 441, 181 N.E.2d at 107.
 

 In viewing the seven allegedly libelous statements within the context of the entire segment entitled “Arson and Profit”, this court is convinced that the broadcast “stripped of innuendo” charges the plaintiff with sufficient acts to constitute a criminal offense and is therefore libelous
 
 per se.
 
 The words themselves with the visual narrative are so obviously and inevitably hurtful to the plaintiff that damages to his reputation may be presumed. At the minimum, this court finds that the segment imputes to the plaintiff .involvement with the Roberts group and knowledge of the criminal circumstances surrounding fires caused by arson in buildings owned by that group. For that reason, no finding is made at this juncture whether the program imputes the crime of arson or murder to the plaintiff; whether the segment was in fact so understood is a question that can await the presentation of evidence.
 
 See, e.g., Troman v. Wood, supra,
 
 62 Ill.2d at 189, 340 N.E.2d at 294. Mr. Rivera observed in his introduction that circumstantial evidence is sufficient to prove the commission of arson, and that the program would portray such extraordinary circumstantial evidence concerning a group of men operating in the Uptown community of Chicago. Subsequent reference is made to the “evidence” elicited by ABC News and others in order to prove the group’s involvement in criminal activity. Lastly, Mr. Downs alludes in his closing remarks to the “compelling evidence” established by Mr. Rivera and his associates. Clearly, the gist of the program was to convince the ordinary viewer that the group was responsible for several fatal fires caused by arson. There is no doubt whatsoever that Mr. Cantrell was linked directly to the unethical and criminal activities of this group by the program.
 
 Cf., Bravo Realty, Inc. v. C.B.S., Inc., supra.
 

 This court notes that the Illinois Supreme Court recently cited with approval the decision rendered by Judge Friendly in
 
 Cianci v. New Times Pub. Co.,
 
 639 F.2d 54 (2d Cir. 1980).
 
 Catalano v. Pechous, supra,
 
 83 Ill.2d at 159, 50 Ill.Dec. at 248, 419 N.E.2d at 356. In citing Judge Friendly’s decision, the court noted that the principle which constitutionally protects a pejorative statement of opinion concerning a public figure does not cover a charge which could reasonably be understood as imputing specific criminal or other wrongful acts.
 
 Id.
 
 83 Ill.2d at 161, 50 Ill.Dec. at 248, 419 N.E.2d at 356. In other words, accusations of criminal activity, even in the form of opinion, are not constitutionally protected. For that reason, the plaintiff’s libel claim is actionable even if the defendant’s statements are construed as opinions.
 

 Defendants argue that each of the four statements alleged to be libelous during the interview between the plaintiff, Rivera, and Lance are true in substance by virtue of Cantrell’s own admissions. Defendants correctly note that it is sufficient to show that the gist or sting of the defamatory imputation is true.
 
 Mitchell v. Peoria Journal-Star, Inc., 76
 
 Ill.App.2d 154, 162, 221 N.E.2d 516, 521 (1966). However, the gist or sting of the interrogation conducted
 
 *750
 
 by Rivera and Lance was that the plaintiff was responsible for committing arson. This became self-evident when Rivera bluntly asked Cantrell whether he burned his buildings. Cantrell’s response to this was “no siree”, which cannot in any way be construed as an admission. In addition, Rivera asks Cantrell why he would have spoken to Lance about committing a crime to defraud an insurance company. Cantrell emphatically denied that he was committing any such crime, or that he spoke to Lance of his knowledge about arson techniques from any first-hand experience. (Tr. 11). In view of those express denials, the “substantial truth” of the allegations made by Rivera and Lance was certainly not established by the plaintiff’s responses.
 

 Defendants also contend that statements phrased as questions cannot amount to an imputation because they are capable of alternative constructions and answers by their nature. This court does not agree. The questions with which Rivera' and Lance “confronted” the plaintiff were accusatory in nature as demonstrated by the context of the entire broadcast. The fact that Lance had raised his voice during his questioning and was shouting at one point confirms that conclusion. In addition, the fact that Rivera finally asked Cantrell whether he burned his buildings had precisely the same effect as a direct accusation in a statement form. At least one renowned commentator, in discussing whether a defamatory meaning is conveyed, has written that “the form of the language used is not controlling, and there may be defamation by means of a question, an indirect insinuation, an expression of belief or opinion, or sarcasm or irony.” Prosser, Law
 
 of Torts,
 
 Chap. 19, section 111, p. 746 (4th Ed. 1971). For that reason, words in the form of questions may also be defamatory in nature.
 

 The clear and unequivocal message conveyed was that the plaintiff had engaged in criminal conduct. To conclude that the relevant segments were susceptible of innocent construction is to indulge in a fiction to the detriment of reason and logic. There is simply no way by which the segment can be construed as imputing anything other than criminal activity to the plaintiff and this court so holds as a matter of law.
 

 When the seven statements underlying the libel claims in Counts I, II, and III are considered in the context of the entire segment, the program suggests that the plaintiff was involved with a group of individuals engaged in a conspiracy to commit the crimes of arson and insurance fraud. However, no finding is made for purposes of this motion whether defendants imputed the commission of the crimes of arson and murder to the plaintiff.
 

 II.
 
 Invasion of Privacy
 

 In addition to the defamation claim, plaintiff alleges in Count IV that defendant ABC “invaded Cantrell’s right of privacy by placing him in a false light before the eyes of his family, friends, employees and the general public.” Plaintiff claims that ABC knew of the falsity of the communications in the broadcast, or that ABC acted with reckless disregard of whether the communications were true or false. The court agrees with the parties that the law of Illinois applies to this diversity action.
 

 The law of Illinois has recognized the right to privacy as well as the right to a remedy for invasion of such right both through the legislature and through the judiciary.
 
 See
 
 Ill.Const., art. I, secs. 6, 12;
 
 Leopold v. Levin,
 
 45 Ill.2d 434, 440, 259 N.E.2d 250, 254 (1970). Illinois courts have also adopted the four distinct torts of privacy as expressed by Professor William L. Prosser and by the Restatement (Second) of Torts: (1) an unreasonable intrusion upon the seclusion of another, (2) the appropriation of another’s name or likeness, (3) a public disclosure of private facts, or (4) publicity which unreasonably places another in a false light before the public.
 
 Midwest Glass Co. v. Stanford Development Co.,
 
 34 Ill.App.3d 130, 133, 339 N.E.2d 274, 277 (1975). It is clear that this court need only concern itself with the fourth category of invasion of privacy because plaintiff alleges that the broadcast unreasonably placed him in a false light.
 

 
 *751
 
 Defendants contend that no invasion of privacy can be asserted in this case because the broadcast of the segment on “Arson and Profit” concerned matters of “legitimate public interest.” Defendants correctly observe that Illinois courts have limited the right of privacy in areas of legitimate public interest.
 
 Adreani v. Hansen,
 
 80 Ill.App.3d 726, 730, 36 Ill.Dec. 259, 263, 400 N.E.2d 679, 683 (1980);
 
 Eick v. Perk Dog Food Co.,
 
 347 Ill.App. 293, 299, 106 N.E.2d 742, 745 (1952). No contention is made that the plaintiff either expressly or implicitly consented to the communications about him.
 

 In discussing the
 
 Eick
 
 case, the Illinois Supreme Court precisely observed that the right of privacy is a limited one in areas of legitimate public interest “as where there is a legitimate news interest in one’s photograph or likeness as a public figure.”
 
 Leopold v. Levin, supra,
 
 45 Ill.2d at 440, 259 N.E.2d at 254 citing
 
 Eick v. Perk Dog Food Co., supra,
 
 347 Ill.App. at 299,106 N.E.2d at 745. Significantly, the court in the
 
 Eick
 
 case found no legitimate public interest in using plaintiff’s photograph for an advertisement because plaintiff was not a public figure and there was no legitimate news interest in her likeness.
 
 Eick v. Perk Dog Food Co., supra,
 
 347 Ill.App. at 299, 106 N.E.2d at 745. Presumably, a legitimate news interest might have arisen if the likeness were that of a public rather than of a private figure.
 
 See Leopold v. Levin, supra,
 
 45 Ill.2d at 440, 259 N.E.2d at 254.
 

 The plaintiff in the
 
 Leopold
 
 case was an accomplice in the notorious Leopold-Loeb murder, to which he had plead guilty in 1924. Defendants included the author, publishers, producers, and several local distributors of a novel, play, and movie entitled “Compulsion.” Plaintiff was paroled in 1958 and in that year his autobiographical story about the crime and the subsequent prosecution was published. According to the Illinois Supreme Court, public interest in the crime and its principals did not wane with the passage of time and the case became an historical
 
 cause celebre. Id.,
 
 45 Ill.2d at 436, 259 N.E.2d at 252. Plaintiff claimed that his privacy had been invaded by the exploitation of his name, likeness, and personality for commercial gain in “knowingly fictionalized accounts” of his private life.
 

 In holding that plaintiff did not have a legally protected right of privacy, the Court listed its primary considerations: the liberty of expression constitutionally assured in a matter of public interest, which it found applicable in that case; the enduring public attention to the plaintiff’s crime and prosecution; and the plaintiff’s consequent and continuing status as a public figure.
 
 Id.,
 
 45 Ill.2d at 441, 259 N.E.2d at 254. It was important to the court that the plaintiff became and remained a public figure because of his criminal conduct in 1924; as a result, no right of privacy attached to matters associated with his participation in that widely publicized crime.
 
 Id.,
 
 45 Ill.2d at 442, 259 N.E.2d at 255. In view of the publication of plaintiff’s autobiographical story, the court observed that plaintiff did not appear to seek retirement from public attention and that the core of the novel and film were part of the plaintiff’s life which he caused to be placed in public view. Plaintiff was a public figure and the matters concerning his life had largely been introduced to the public domain by the plaintiff himself. In view of those factors, it is no surprise that the court dismissed plaintiff’s claim for invasion of privacy.
 

 The case of
 
 Adreani v. Hansen, supra,
 
 upon which the defendants rely, basically comports with the
 
 Leopold
 
 rationale. Plaintiffs were builders and real estate developers of property which the Northbrook Park district sought to acquire for a leisure park project. After a disagreement arose between the parties, the park district instituted condemnation proceedings in the circuit court of Cook County. While those proceedings were pending, a letter appeared in a weekly newspaper which plaintiffs alleged invaded their privacy because it unreasonably placed them in a false light before the public.
 
 Adreani v. Hansen, supra.
 
 Significantly, plaintiffs conceded that they were thrust into the public eye by the park
 
 *752
 
 district’s filing of condemnation proceedings so that, in effect, they were public figures in the midst of a public controversy surrounding the land acquisition.
 
 Id.,
 
 80 Ill.App.3d at 730, 36 Ill.Dec. at 262-263, 400 N.E.2d at 682-683. The court found that the park district’s attempt to acquire the real estate owned by plaintiffs for a public project was a matter of legitimate public interest and concern.
 
 Id.
 
 80 Ill.App.3d at 730, 36 Ill.Dec. at 263, 400 N.E.2d at 683. As a result of both that factor and the plaintiffs’ status as public figures, the invasion of privacy claim was dismissed.
 

 It is apparent that a significant factor in the
 
 Eick, Leopold,
 
 and
 
 Adreani
 
 eases was the status of the plaintiff either as a private or public, figure. In both
 
 Leopold
 
 and
 
 Adreani,
 
 the plaintiffs were found to have no right to privacy largely because of their status as public figures. In
 
 Eick,
 
 the privacy claim was allowed because the plaintiff was not a public figure and therefore there could be no legitimate news interest in using plaintiff’s likeness in an advertisement. In sum, a finding that plaintiff is a public figure facilitates a finding that a legitimate public interest exists with respect to the publication or broadcast at issue.
 

 It is clear that James Cantrell cannot be deemed a public figure. He was employed as a manager of buildings in the Uptown community of Chicago both prior to and at the time of the 20/20 broadcast. For the most part those who attain the status of “public figure” have assumed roles of especial prominence in the affairs of society.
 
 See, e.g., Gertz v. Robert Welch, Inc.,
 
 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). More commonly, those deemed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of issues involved.
 
 Id.
 
 418 U.S. at 345, 94 S.Ct. at 3009. Mr. Cantrell did not assume any role of especial prominence in the affairs of society, and he certainly did not thrust himself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it.
 
 See Time, Inc. v. Firestone,
 
 424 U.S. 448, 453, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). In fact, Mr. Cantrell was introduced into the broadcast by hidden cameras and by interviews conducted by an ABC producer posing as a real estate developer.
 

 Although it is not necessary for an individual to seek publicity actively in order to be found in the “public eye”, the individual cannot be deemed public merely because of the broadcast or publication alone. In
 
 Beresky v. Teschner,
 
 64 Ill.App.3d 848, 855, 21 Ill.Dec. 532, 537, 381 N.E.2d 979, 984 (1978), the renowned article by Justice Brandéis and Mr. Warren was cited:
 

 It is also recognized that the right of privacy does not prohibit any publication of matter which is of public or general concern; and while the general object in view is to protect the privacy of private life, nevertheless, to whatever degree and in whatever connection a person’s life has ceased to be private, BEFORE THE PUBLICATION UNDER CONSIDERATION HAS BEEN MADE, to that extent the protection is to be withdrawn. Brandeis-Warren Essay, 4 Harv.L.Rev. 193, p. 214 (emphasis supplied).
 

 Certainly, the affairs of Mr. Cantrell were at all times private before the broadcast of the 20/20 segment, and the protection of his right to privacy cannot be withdrawn because of the defendants’ decision to portray him on a national television broadcast. Such protection should be favored where the plaintiff is not a public figure or official.
 

 The gist of plaintiff’s claim in Count IV is that the broadcast of the 20/20 segment gave the false impression of Mr. Cantrell’s actual involvement in an arson for profit scheme; this case involves what is claimed to be a false but purportedly factual account of the plaintiff’s involvement with the Roberts group. Unlike the publications in
 
 Leopold v. Levin, supra,
 
 the broadcast at issue here did not represent its content to be a fictional or dramatized account “suggested” by a true incident.
 
 Leopold v. Levin, supra,
 
 45 Ill.2d at 445, 259 N.E.2d at 256. As a result, the distinction made by
 
 *753
 
 the Illinois Supreme Court of
 
 Time v. Hill,
 
 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), which involved an untrue but supposedly factual magazine account, is germane to this case.
 
 Id.,
 
 45 Ill.2d at 445, 259 N.E.2d at 256. The right of privacy deserves more protection where the content of the injurious publication or broadcast purports to give a factual account of matters that are untrue, especially where the aggrieved party is not a public figure or official.
 

 This court cannot consider plaintiff a public figure simply because the “arson for profit” scheme in the Uptown community had been a public controversy. As the Supreme Court observed, one cannot equate “public controversy” with all controversies of interest to the public.
 
 Time, Inc. v. Firestone, supra,
 
 424 U.S. at 454, 96 S.Ct. at 965. If so, an absolute privilege would extend to falsehoods invading the privacy of private persons whenever the statements concern matters of general or public interest. Such a result would effectively abolish the right to privacy based upon false light for any private citizens.
 

 The Illinois Supreme Court has observed that the purpose underlying the right of privacy was “to find an area within which the citizens must be left alone”, and that it is important, in defining the limits of this right, for the courts to “proceed with caution.”
 
 Leopold v. Levin, supra,
 
 45 Ill.2d at 440, 259 N.E.2d at 256. In view of the prior finding that the broadcast imputed the commission of crime to the plaintiff, the plaintiff’s status as a private citizen, and the allegation that defendants acted with knowledge of the broadcast’s falsity or in reckless disregard of its truth, this, court cannot conclude that plaintiff has failed to state a cause of action for invasion to his privacy.
 

 III.
 
 Conclusion
 

 For the foregoing reasons, the motion of the defendants to dismiss the libel claims in Counts I, II, and III and the invasion of privacy claim in Count IV is denied.