# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Trannel v. Prairie Ridge Media, Inc.*, 2013 IL App (2d) 120725

---

| | |
|---|---|
| Appellate Court Caption | KAREN TRANNEL, Individually and on Behalf of Her Minor Daughter, M.M.T., Plaintiff-Appellant, v. PRAIRIE RIDGE MEDIA, INC., Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-12-0725 |
| Filed | March 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action seeking damages under the Right of Publicity Act arising from defendant's use of a photograph of plaintiff and her daughter, defendant did not violate the Act when it used the photograph in its publication about the winners of a garden contest, but the Act was violated when the photograph was used without plaintiff's consent in a "media kit" distributed to potential advertisers; however, in the absence of proof of actual damages, plaintiff and her daughter were entitled to the statutory limit of $1,000 each, and the denial of attorney fees, costs and expenses was vacated and the cause was remanded for a hearing on those issues. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 10-LA-167; the Hon. Michael T. Caldwell, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and vacated in part; cause remanded. |

Counsel on
Appeal

Richard C. Balough and Cheryl Dancey Balough, both of Balough Law Offices, LLC, of Chicago, for appellants.

Ronald A. DiCerbo, of McAndrews, Held & Malloy, Ltd., of Chicago, for appellee.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hudson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Karen Trannel, individually and on behalf of her minor daughter, M.M.T., appeals from an order of the circuit court of McHenry County granting summary judgment in favor of defendant, Prairie Ridge Media, Inc. In this appeal, the question we must answer is whether defendant is liable for damages under the Right of Publicity Act (Act) (765 ILCS 1075/1 *et seq.* (West 2010)) for publishing a photograph of plaintiff and her daughter on the cover page of a "media kit" used to generate advertising revenue for *McHenry County Living*, a magazine "celebrating the good life here in McHenry County." For the reasons that follow, we affirm the trial court's judgment in part, reverse in part, vacate in part, and remand for further proceedings.

¶ 2                    BACKGROUND

¶ 3    The facts are not in dispute. Defendant publishes *McHenry County Living* magazine (the magazine) six times a year. The magazine provides information concerning local people, events, and businesses. Fewer than a hundred people subscribe to the magazine for a fee. Otherwise, all of the revenues are generated from advertising. Defendant delivers the magazine, at no charge, to 20,000 homes with household incomes in excess of $75,000 and to hundreds of businesses, including those of its advertisers. People can pick up the magazine free of charge at these businesses. Defendant hopes that people will keep the magazine on their coffee tables, thus increasing the number of times they would see the advertisements.

¶ 4    The spring 2009 issue announced a gardening contest that was open to McHenry County residents. Contestants were required to register online and to submit three photographs of their gardens along with descriptions of the gardens and how the contestants used them. Plaintiff entered the contest. Plaintiff then received an email from defendant notifying her that she was a finalist in the contest. The email also notified plaintiff that "[o]ur photographer Robin Pendergrast will be contacting you *** to set up a photo shoot at your [home]." The photo shoot resulted in Pendergrast taking the photograph of plaintiff and her daughter that

is the subject of this litigation (subject photograph). The subject photograph depicts plaintiff and her daughter smiling at the camera in a garden of what appear to be black-eyed Susans. Neither defendant nor Pendergrast, who was an independent contractor rather than defendant's employee, obtained a written release for the use of the subject photograph.

¶ 5 On October 8, 2009, defendant notified plaintiff in an email that she was a winner in the contest. The email advised that "[t]he [a]utumn issue is chock-full of great photos and details about the gardens" and would be "all around the county" in about a week. The autumn 2009 issue contained a photo of each winner's garden with a smaller photo inset of the winners themselves and a brief caption explaining the gardens. The photo inset accompanying the photo of plaintiff's garden was the subject photograph.

¶ 6 Following the publication of the autumn 2009, defendant prepared the "McHenry County Living Media Kit & Editorial Calendar 2010," which the parties refer to as the "media kit." Defendant, through its salespeople (who are not defendant's employees), gave the media kit to various advertisers, some of whom were current advertisers, for the purpose of generating additional advertising revenue. The media kit was four pages. The first, or cover, page bore the magazine's logo. Beneath the logo appeared the words "Media Kit & Editorial Calendar 2010." To the right of the logo was a picture of a pink flower. Above the logo were two photographs. The photograph on the left side of the page depicted three young children doing crafts. The children were smiling at the camera and were recognizable. The photo on the right side of the page depicted a crowd of people sitting in lawn chairs and on blankets on the ground around a gazebo or a bandstand in a park, obviously partaking in a community event. Some of the people in the right-side photograph were recognizable. There were three photos in the middle of the page. The left photo depicted diners under umbrellas, on a patio overlooking a large body of water. None of the people was recognizable. The middle photo was the subject photograph. The right photo depicted three children in winter jackets, walking on a suspension bridge. Two of the children had their backs to the camera, but the third child's face was in profile and could be recognized. Three more photos appeared at the bottom of the page. The left photo depicted a clearly recognizable man working with pastry dough. The middle photo depicted five young women, all clearly recognizable, pushing a bed in the 2008 Harvard Milk Day races. The right photo depicted two cyclists, one facing the camera and recognizable. Other than the logo and the words "Media Kit & Editorial Calendar 2010," the only writing appeared directly beneath the subject photograph. It read: "Celebrating the good life right here in McHenry County through our beautiful bimonthly magazine, our weekly e-newsletter–*and every day online!*" (Emphasis in original.)

¶ 7 The second page of the media kit described the magazine, its readership, its circulation, and how to access the magazine in electronic form. The page was adorned with three photographs: the first was the face of a young girl sipping a drink; the second depicted a head-and-shoulders shot of a couple smiling at the camera; and the third was a photo of a clock tower in a garden of tulips. The third page highlighted the magazine's features and included six color photos, in which people were recognizable. The fourth page contained the magazine's advertising rates and "specs."

¶ 8 Carla Housh, defendant's president and the magazine's publisher/editor, testified at her deposition that the media kit was a "sales tool," an "information medium" that was provided

to potential and current advertisers to inform them of the magazine's advertising rates. Because the salespeople were not defendant's employees, defendant did not keep a record of everyone to whom the media kit was distributed. However, in response to the trial court's directive to produce a list, defendant named 31 advertisers, 27 businesses and 4 individuals, that might have received the media kit. There is no evidence in the record as to whether any of the 31 advertisers received a kit containing the cover page with the subject photograph or whether any of the 31 purchased advertising because of the subject photograph.

¶ 9    Plaintiff learned that the subject photograph had been included in the media kit when a friend notified her of the fact on January 12, 2010. On January 14, 2010, plaintiff complained to defendant about the use of the subject photograph. The record shows that at some time following January 14, but before plaintiff's cease-and-desist letter of January 26, 2010, defendant stopped using the cover page.

¶ 10   On May 4, 2010, plaintiff filed a complaint. Count I was for "unauthorized appropriation of likeness," and count II alleged a violation of the Act. Plaintiff requested injunctive relief, actual damages, punitive damages, and attorney fees and costs. Both parties filed motions for partial summary judgment. However, on April 13, 2012, both parties then filed cross-motions for summary judgment. On June 15, 2012, the trial court granted summary judgment in favor of defendant and denied plaintiff's motion for summary judgment. This timely appeal followed.

¶ 11                                    ANALYSIS

¶ 12   Plaintiff contends that she is entitled to actual damages, punitive damages, and attorney fees, costs, and expenses under the Act, because defendant used her and her daughter's identities for commercial purposes without obtaining previous written consent. Although plaintiff conceded at her deposition that the first publication of the subject photograph, in connection with the garden contest, was not in issue, she now contends that, if we determine that the first publication was for commercial purposes rather than a news article, it also was a violation of the Act. Defendant maintains that summary judgment was properly granted in its favor, because the magazine and the media kit were a single "commercial device" employed to generate advertising revenue. Defendant's theory, adhering to the trial court's findings in its written order, seems to be that, despite two separate publications of the subject photograph, there was only one purpose (to generate advertising revenue), to which plaintiff consented when she entered the garden contest and allowed Pendergrast to take the subject photograph.

¶ 13   Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Buffa v. Haideri*, 362 Ill. App. 3d 532, 537 (2005). Summary judgment is a drastic remedy that should be allowed only when the right of the moving party is clear and free from doubt. *Buffa*, 362 Ill. App. 3d at 537. Here, as we indicated above, the parties filed cross-motions for summary judgment. When parties file cross-motions for summary judgment, they invite the court to decide the issues as a matter of law. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Our review is *de novo*.

*Buffa*, 362 Ill. App. 3d at 537.

¶ 14     Effective January 1, 1999, the common-law tort of appropriation of one's likeness, also sometimes referred to as the right of publicity, ceased to exist in Illinois, because the Act completely replaced it (*Blair v. Nevada Landing Partnership, RBG, LP*, 369 Ill. App. 3d 318, 322-23 (2006)), although the Act essentially codified the common-law right of publicity (*Brown v. ACMI Pop Division*, 375 Ill. App. 3d 276, 283 (2007)). Section 30(a) of the Act provides that a person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent. 765 ILCS 1075/30(a) (West 2010). "Identity" includes a photograph. 765 ILCS 1075/5 (West 2010). "Commercial purpose" means the "public use" or "holding out" of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of "advertising or promoting" products, merchandise, goods, or services; or (iii) for the purpose of fundraising. 765 ILCS 1075/5 (West 2010). A person who violates the Act can be liable for either actual damages, profits derived from the unauthorized use, or both, or $1,000. 765 ILCS 1075/40(a)(1), (a)(2) (West 2010). Punitive damages may be awarded for a willful violation of the Act. 765 ILCS 1075/40(b) (West 2010). Section 55 of the Act provides that the court "may" award to the prevailing party reasonable attorney fees, costs, and expenses. 765 ILCS 1075/55 (West 2010).

¶ 15     Before the Act, the tort of appropriation of one's likeness was one of four recognized forms of invasion of privacy. *Geisberger v. Willuhn*, 72 Ill. App. 3d 435, 439 (1979). Historically, the tort developed under the rubric of privacy law, which was used by some courts to deny celebrities recovery, since a celebrity, by virtue of his or her fame, lacked privacy. Alicia M. Hunt, Comment, *Everyone Wants to be a Star: Extensive Publicity Rights for Noncelebrities Unduly Restrict Commercial Speech*, 95 Nw. U. L. Rev. 1605, 1606 (2001). The courts then established the right of publicity to protect the commercial value of a celebrity's identity, rather than a privacy interest. Alicia M. Hunt, Comment, *Everyone Wants to be a Star: Extensive Publicity Rights for Noncelebrities Unduly Restrict Commercial Speech*, 95 Nw. U. L. Rev. 1605, 1606 (2001). The two torts were, thus, distinct. Andrew J. McClurg, *A Thousand Words Are Worth a Picture: A Privacy Tort Response to Consumer Data Profiling*, 98 Nw. U. L. Rev. 63, 107 (2003). Dean William Prosser subsumed the two into one cause of action and defined it as protective of both personal and economic interests. *Joe Dickerson & Associates, LLC v. Dittmar*, 34 P.3d 995, 1000 (Colo. 2001) (*en banc*) (citing William Prosser, *Privacy*, 48 Cal. L. Rev. 383, 389 (1960)). In other words, the tort protected a private individual whose harm was to personal feelings as well as the celebrity whose likeness had an established value. The difference was in the amount of damages to be awarded.

¶ 16     To allege a common-law appropriation-of-likeness or right-of-publicity claim, a plaintiff had to set forth three elements: (1) an appropriation of one's name or likeness; (2) without one's consent; and (3) for another's commercial benefit. *Blair*, 369 Ill. App. 3d at 322. Under the Act, the elements are essentially the same (*Blair*, 369 Ill. App. 3d at 323), although the Act expands the scope and availability of the cause of action (Stephen P. Trimper, *The New Illinois Right of Publicity Act*, 11 D.C.B.A. Brief 26 (1999)).

¶ 17     In order to determine whether defendant is liable under the Act, we must construe it. The

cardinal rule of statutory construction is to ascertain and give effect to legislative intent. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. The best indication of the legislature's intent is the statutory language, given its plain and ordinary meaning. *Nowak*, 2011 IL 111838, ¶ 11. "Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction." *Nowak*, 2011 IL 111838, ¶ 11.

¶ 18       Section 10 of the Act proclaims that "[t]he right to control and to choose whether and how to use an individual's identity for commercial purposes is recognized as each individual's right of publicity." 765 ILCS 1075/10 (West 2010). An "individual" is a living or deceased natural person. 765 ILCS 1075/5 (West 2010). "Identity" means "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener" and includes, but is not limited to, "(i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." 765 ILCS 1075/5 (West 2010). As noted, "Commercial purpose" means the "public use" or "holding out" of "an individual's identity" (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of "advertising or promoting" products, merchandise, goods, or services; or (iii) for the purpose of fundraising. 765 ILCS 1075/5 (West 2010).

¶ 19       Here, there is no question that plaintiff and her daughter are individuals and that the subject photograph constituted their "identities." The issue is whether defendant used the subject photograph for commercial purposes.

¶ 20       We first look at whether the use of the subject photograph was a "public" use. The statute does not define "public" use. However, the word "public" is unambiguous and means the "aggregate of the citizens" or "everybody" or the "people at large" or the "community at large." (Internal quotation marks omitted.) *Andersen Consulting LLP v. UOP*, 991 F. Supp. 1041, 1042 (N.D. Ill. 1998). We may take judicial notice that the population of McHenry County in 2010 was 308,760 (see *System Development Services, Inc. v. Haarmann*, 389 Ill. App. 3d 561, 575 (2009) (appellate court took judicial notice of the population of Effingham County)). In a county with a population of roughly 300,000 people, the media kit might have been distributed to 27 businesses and 4 individuals, all of them either current or potential advertisers in the magazine. Under this scenario, we do not believe that the subject photograph, assuming that all 31 advertisers, or potential advertisers, saw it, was disseminated to the public.

¶ 21       The statute addresses the "public use" *or* "holding out" of an individual's identity. "Holding out" is not defined, but it must mean something other than "public use." See *In re M.T.*, 221 Ill. 2d 517, 524 (2006) ("Whenever possible, each word [of a statute] should be construed to avoid rendering it superfluous."). The only applicable dictionary definition of "hold out" is "to make out to be: represent." Webster's Third New International Dictionary 1079 (1993). This is consistent with the way courts have construed "holding out" in other contexts. For instance, in medical negligence cases, hospitals may be found vicariously liable where they hold out a particular physician as their agent. See *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 833-34 (2009). In *Cooney v. Magnabosco*, 407 Ill. App. 3d 264 (2011), the court held that, in order to state a claim for illegal practice as a certified shorthand reporter, the plaintiff had to plead and prove that the defendant actually practiced and/or held herself out as a certified shorthand reporter. *Cooney*, 407 Ill. App. 3d

at 270. In *In re Parentage of Scarlett Z.-D.*, 2012 IL App (2d) 120266, ¶ 39, we held that the adoptive mother was not equitably estopped from challenging the nonadoptive father's standing even though she had held out to the world that the child and the nonadoptive father had a father-daughter relationship. Here, the Act prohibits the holding out–meaning the representation–of an individual's identity on or in connection with certain activities. Housh testified at her deposition that she, along with two assistants, chose the subject photograph for the cover of the media kit. We conclude that, in deliberately placing plaintiff's and her daughter's identities on the cover, defendant was representing, or holding out, plaintiff's and her daughter's identities.

¶ 22    The "holding out" must have occurred, *inter alia*, on or in connection with the offering for sale or sale of a product, merchandise, goods, or services. 765 ILCS 1075/5 (West 2010). The subject photograph appeared on the cover of the media kit, so it was "on" or "in connection" with the media kit. The question is whether the media kit was an offering for sale of a product, merchandise, goods, or services. The media kit consisted of four pages. The last page contained the ad rates. Also on the last page was the following: "All 6x ad schedules include turnkey design and production services." We conclude that the media kit was an offer for the sale of those "design and production" services. Likewise, the subject photograph was held out for purposes of promoting those services. See 765 ILCS 1075/5 (West 2010).

¶ 23    Defendant claims that the media kit and the magazine are bundled into one "commercial device" that was covered by plaintiff's consent to the subject photograph appearing in the article announcing the garden-contest winners. Housh testified at her deposition that both the magazine and the media kit were vehicles to generate advertising revenue. From this, defendant concludes that since, from defendant's point of view, the purpose of each was the same–to attract advertisers–plaintiff consented to the unrestricted use of the subject photograph for that advertising purpose.

¶ 24    We disagree. Our research into the history of the common-law tort of appropriation and the right of publicity disclosed no such term of art as "commercial device." Nor do we coin it now. The right of privacy–the right of the individual to be let alone–is a personal right that was recognized in the seminal case of *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 78 (Ga. 1905). Our supreme court recognized the right of privacy in *Leopold v. Levin*, 45 Ill. 2d 434, 440 (1970), declaring that "[p]rivacy is one of the sensitive and necessary human values." *Leopold*, 45 Ill. 2d at 440. Here, we cannot ignore that defendant published the subject photograph twice. While defendant might have obtained a complete release covering all uses, it did not do so. It is conceivable that plaintiff would not object to one publication but would object to the other, particularly where her and her daughter's identities were used to serve the economic interests of defendant rather than to serve an interest of plaintiff, such as publicizing her garden.

¶ 25    Contrary to defendant's argument, we believe that the two publications of the subject photograph were for entirely different purposes, one covered by the Act, one not. Section 35 of the Act exempts from its application, *inter alia*, the "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." 765 ILCS 1075/35(b)(2) (West 2010). "News" is a "report of a

-7-

recent event: new information: fresh tidings." Webster's Third New International Dictionary 1525 (1993). In this respect, "news" is broader than reporting on public affairs, that is, politics and public policy. The subject photograph appeared in the autumn 2009 issue of the magazine in connection with the announcement of the garden-contest winners. Reporting who won the contest was reporting a recent event and new information. Thus, the use of the subject photograph to accompany the article was for the purpose of "news" and was exempted from the Act. Indeed, such types of events are regularly reported on the local nightly news broadcasts.

¶ 26    On the other hand, as we demonstrated above, the use of the subject photograph on the cover of the media kit was for commercial purposes, as defined by the Act. Consequently, defendant needed plaintiff's written consent to use the subject photograph on the media kit. Defendant contends that such consent can be found in the rules for the garden contest and in the emails plaintiff exchanged with members of defendant's staff. Nowhere in the rules is there any language that would advise a contest entrant that, by entering the contest, he or she agreed to the unlimited use of his or her likeness for commercial purposes. Nor do the emails establish such consent. Plaintiff's email served as her entry form. Defendant advised plaintiff by email that she was a finalist and would be contacted by Pendergrast. This email mentioned the photographer but did not reference any uses to be made of the photographs. The email in which defendant advised plaintiff that she was a winner contained the information that the autumn issue of the magazine was "chock-full" of photos and details about the gardens. That email made no mention of the subject photograph or using it for purposes other than in connection with the article announcing the winners. Accordingly, we conclude that use of the subject photograph on the cover of the media kit without plaintiff's written consent violated section 30 of the Act.

¶ 27    We next consider damages. Plaintiff first claims that she is entitled to $38,933, as the profits defendant derived from the use of the subject photograph. She arrives at this figure as follows:

> "[Plaintiff] used the advertisements placed by the [31 advertisers disclosed by defendant] in [the magazine's] 2010 issues and calculated the revenues received by [defendant] for those advertisements, which totaled $38,933."

¶ 28    Defendant responds that those damages are speculative and without foundation in the evidence. Defendant points out that it did not keep a record of who received the media kit; there is no way to establish that each of the 31 disclosed advertisers actually saw the subject photograph; and there is no evidence that any of the 31 advertisers purchased space as a result of having seen the subject photograph. Apparently, plaintiff did not depose any of the 31 advertisers.

¶ 29    However, according to plaintiff, defendant had a duty under *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112 (1998), to preserve the evidence or suffer adverse inferences. In *Shimanovsky*, a product liability case, the plaintiffs' case was dismissed as a sanction for their expert destroying the power-steering components of their automobile during testing, thus depriving the defendant of an opportunity to conduct its own tests. *Shimanovsky*, 181 Ill. 2d at 117-18. Our supreme court held that a potential litigant owes a duty to take

reasonable measures to preserve the integrity of relevant and material evidence. *Shimanovsky*, 181 Ill. 2d at 121-22.

¶ 30    *Shimanovsky* is not applicable. The general rule in Illinois is that there is no duty to preserve evidence. *Martin v. Keeley & Sons, Inc.*, 2012 IL 113270, ¶ 27. There is a two-prong test a plaintiff must meet in order to establish an exception to the general rule: (1) a plaintiff must show that an agreement, contract, statute, special circumstance, or voluntary undertaking has given rise to a duty to preserve evidence; and (2) a plaintiff must show that the duty extends to the specific evidence at issue, by demonstrating that a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action. *Martin*, 2012 IL 113270, ¶ 27. Here, plaintiff does not argue the existence of either prong. The record does not disclose any evidence relating to the first prong. With regard to the second prong, at the time defendant handed out the media kits to its salespeople, it had no idea that the cover would involve it in litigation. Moreover, plaintiff's argument really is that defendant had a duty to create evidence. Housh testified at her deposition that she did not keep track of to whom the salespeople gave the media kits. Plaintiff's position is that Housh should have kept records. This argument is meritless.

¶ 31    We agree with defendant that plaintiff cannot prove profits. The Act provides for the recovery of profits that a defendant "derived from the unauthorized use." 765 ILCS 1075/40(a)(1) (West 2010). Section 45 of the Act provides that the plaintiff is required to prove the "gross revenue attributable to the unauthorized use." 765 ILCS 1075/45(a) (West 2010). Consequently, plaintiff must prove that the $38,933 she claims as profits were directly attributable to the unauthorized use of the subject photograph. All plaintiff has presented is speculation that the 31 advertisers saw the subject photograph and as a result placed advertisements in the 2010 issues. The record is devoid of any evidence of a connection between the advertising revenue and the subject photograph. Plaintiff admitted that all she did to compute gross revenue was add up the advertising dollars. She made no attempt to prove the crucial link between those dollars (assuming the amount is correct) and the subject photograph. The cover page contained eight other photographs, some of them with more than one recognizable person in them. If any of the advertisers were moved to place ads because of the cover (which was not proved), any of the other eight photos could have been the reason.

¶ 32    In the absence of proof of actual damages or profits attributable to the unauthorized use, the Act provides for damages in the amount of $1,000. 765 ILCS 1075/40(a)(2) (West 2010). Accordingly, we hold that plaintiff is entitled to damages in the amount of $1,000. Plaintiff is also suing on behalf of her minor daughter, who is entitled to $1,000 as well.

¶ 33    We next consider whether plaintiff is entitled to punitive damages. The Act provides for punitive damages for a willful violation of section 30. 765 ILCS 1075/40(b) (West 2010). Here, we agree with defendant that its actions were not willful. According to Housh, she believed that plaintiff's consent to use the subject photograph in the magazine was consent for all purposes. Housh testified at her deposition that Pendergrast owned the image and that she requested his permission to use it on the cover of the media kit. While Housh's assumptions were wrong, they demonstrate that her actions were not a willful violation of the Act. She took steps to try to do the right thing. Plaintiff complains that defendant

continued to disseminate the cover with the subject photograph after plaintiff instructed it not to do so. The evidence shows that Housh took immediate steps to rectify the situation. She contacted an attorney for advice. She instructed the salespeople to remove the cover when showing the media kit to potential advertisers. Between January 14, 2010, when plaintiff made the complaint to Housh, and January 26, 2010, when plaintiff's attorney sent a cease-and-desist letter, defendant had ceased using the cover.

¶ 34    Punitive damages are disfavored. *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815, 828 (2003). A court may award punitive damages where the tortious acts are malicious or where they display a reckless disregard for others' rights. *Petty*, 343 Ill. App. 3d at 828. The purpose of punitive damages is to punish the tortfeasor and to deter others from the same conduct. *Petty*, 343 Ill. App. 3d at 828. Here, defendant violated the letter of the Act. Defendant's actions were not malicious or willful, as discussed above. Plaintiff does not claim that she or her daughter suffered mental anguish, ridicule, humiliation, or emotional distress as a result of defendant's acts. Although the inclusion of the subject photograph on the cover of the media kit violated the Act, the facts in the instant case are unlike the fact scenarios that brought the tort of appropriation into being in Illinois.

¶ 35    In *Eick v. Perk Dog Food Co.*, 347 Ill. App. 293 (1952), the plaintiff was a blind girl who owned a seeing-eye dog. *Eick*, 347 Ill. App. at 294. The defendants, without the plaintiff's consent, used the plaintiff's photograph in an advertisement promoting the sale of dog food. *Eick*, 347 Ill. App. at 294. The defendants were conducting an advertising campaign to promote sales of their dog food by running a contest through which purchasers of the dog food could aid the visually handicapped. *Eick*, 347 Ill. App. at 306. The advertisement depicted the plaintiff as the potential donee of a " 'Master Eye Dog.' " *Eick*, 347 Ill. App. at 294. This caused the plaintiff mental anguish, humiliation, and the loss of admiration and respect of those who knew her. *Eick*, 347 Ill. App. at 294.

¶ 36    In *Annerino v. Dell Publishing Co.*, 17 Ill. App. 2d 205 (1958), the defendant used the plaintiff's photograph, taken while she was in shock and grief over her husband's murder by a gangster, in its magazine "Inside Detective." *Annerino*, 17 Ill. App. 2d at 206-07. The photograph was used, without the plaintiff's consent, in conjunction with a sensationalized and dramatized title, subtitle, and narrative of the crime. *Annerino*, 17 Ill. App. 2d at 210.

¶ 37    In *Smith v. WGN, Inc.*, 47 Ill. App. 2d 183 (1964), the plaintiff willingly allowed a movie to be made of himself playing tennis. *Smith*, 47 Ill. App. 2d at 185. Without the plaintiff's consent, the defendants produced and aired a commercial for a hair product that used a part of the movie showing the plaintiff serving a tennis ball and running to the net while a voice-over described the merits of the hair product, a bottle of which was shown on-screen. *Smith*, 47 Ill. App. 2d at 184. The plaintiff claimed that he suffered humiliation and mental anguish. *Smith*, 47 Ill. App. 2d at 184.

¶ 38    What the plaintiffs in the above cases have in common is that the defendants exploited some trait specific to the plaintiffs, such as blindness, grief, and athletic ability, for commercial gain. Here, defendant used the subject photograph to illustrate the magazine's theme–"celebrating the good life right here in McHenry County"–in its media kit, which advocated the benefits of advertising in the magazine. Housh testified that the cover

photographs were chosen because they were pleasing. Looking at the cover of the media kit, the viewer does not infer that the persons depicted in the photos are endorsing any product. This also distinguishes the instant case from *Ainsworth v. Century Supply Co*., 295 Ill. App. 3d 644 (1998), upon which plaintiff relies.

¶ 39　　In *Ainsworth*, the plaintiff consented to make an instructional video on installing tile for distribution to Century's customers. *Ainsworth*, 295 Ill. App. 3d at 646. Century then hired a company, TCI, to create a television commercial. *Ainsworth*, 295 Ill. App. 3d at 646. A part of the video in which the plaintiff participated was inserted into the commercial, which was shown on television. *Ainsworth*, 295 Ill. App. 3d at 646-47. As in *Eick* and *Smith*, a characteristic, or a talent, possessed by the plaintiff was exploited for purposes of an endorsement. Such egregious conduct simply is not present in our case. Accordingly, plaintiff is not entitled to punitive damages.

¶ 40　　Plaintiff next contends that she is entitled to attorney fees, costs, and expenses. Section 55 of the Act provides that the court "may" award attorney fees, costs, and expenses. We remand this cause to the trial court for a hearing and determination of whether, in the court's judgment, such fees, costs, and expenses should be awarded.

¶ 41　　　　　　　　　　　　　　　　CONCLUSION

¶ 42　　To recap: the trial court's determination that defendant did not violate the Act is reversed; plaintiff and her daughter are to recover statutory damages in the amount of $1,000 each; the trial court's rulings that plaintiff is not entitled to actual or punitive damages are affirmed; the trial court's ruling that neither party is entitled to attorney fees, costs, and expenses is vacated and the matter is remanded to the trial court for a hearing on the issue of whether plaintiff is entitled to fees, costs, and/or expenses under the Act.

¶ 43　　Affirmed in part, reversed in part, and vacated in part; cause remanded.